## THE "SUNNYSIDE."

1. If a sailing vessel, when approaching a steamer, fails to adopt all reasonable precautions to prevent a collision, she will not be excused, even though she displays her proper signal-lights; and is entitled, in the absence of exceptional circumstances or special danger, to keep her course.

2. A collision occurred on Lake Huron, about three miles from the shore, near the head of St. Clair River, between a steam-tug and a sailing vessel. The former, heading east by north half north, waiting for a tow in conformity with a well-known usage in those waters, with her machinery stopped, but with her signal-lights burning as the law requires of a steamer under way, was drifting at the rate of a mile and a half per hour. The sailing vessel, with all her sails set and displaying her proper signal-lights, was heading north half west at a speed of nine miles per hour. *Held*, that it was the duty of the sailing vessel, in view of the special circumstances, to put up her helm and go to the right, or to put it down and suffer the steam-tug to drift past in safety; and, both vessels being at fault, the damages were equally apportioned between them.

3. The doctrine announced in *The Continental*, 14 Wall. 345, reaffirmed.

APPEAL from the Circuit Court of the United States for the Eastern District of Michigan.

The facts are stated in the opinion of the court.

*Mr. W. A. Moore* and *Mr. Ashley Pond* for the appellants,

and *Mr. F. H. Canfield* and *Mr. D. B. Duffield* for the appellees.

MR. JUSTICE CLIFFORD delivered the opinion of the court.

Marine collisions are every year becoming more and more frequent; and experience shows that a large proportion of the disasters result from the neglect of those in charge of the vessels to comply with the rules of navigation.

Litigations often arise in which the libellants or respondents, or both, allege that nothing more could have been done at the time of the collision by the party making the allegation to have prevented the disaster; and the proofs sometimes show that the allegations in that regard, of both parties, are true, even when it is apparent to a careful observer that both parties are in fault for having placed their respective vessels in a situation where nothing could be done to prevent them from coming together.

Disasters of the kind are doubtless sometimes the result of inevitable accident; but they much more frequently arise from the want of seasonable precaution on the part of those intrusted with the navigation of the vessels, even when the proofs show to a demonstration that nothing more could have been done at the moment of the collision by either party to have prevented the cause of the litigation. *The Virgil*, 2 W. Rob. 205.

Precautions not seasonable are of little or no value, nor do such efforts constitute a compliance with the usages of the sea or the statutory rules of navigation. Such precautions must be seasonable in order to be effectual; and if they are not so, and a collision ensues in consequence of the delay, it is no defence to say that nothing more could be done to avoid the collision, nor that the necessity for precautionary measures was not perceived until it was too late to render them availing. *The Steamboat New York*, 18 How. 225.

Inability to avoid a collision usually exists at the time the collision occurs; but it is seldom a matter of much difficulty to trace the cause of the disaster to some antecedent omission of duty on the part of one or the other, or both, of the colliding vessels. *The Governor*, 1 Cliff. 97.

Suppose it be true that a steamer, after she has approached within a certain distance of a sail-vessel, is not then able to

turn either to the right or to the left so as to avoid a collision: still the proof of that fact without more will not constitute a good defence, if it appears that the fault consisted in placing herself in that situation.

Steamers approaching sail-vessels, if the two are proceeding in such directions as to involve risk of collision, must keep out of the way of the sail-ship; and, in order to perform that duty, the steamer may go either to the right or to the left: but, if the steamer neglects to change her helm until the vessels are so near that the collision cannot be avoided, it is no defence to say that nothing could be done at the moment to avert the disaster, as it would be clear in such a case that the collision might have been prevented if the helm of the steamer had seasonably been put to port or to the starboard.

Rules of navigation are adopted to save life and property; and they are required to be observed, and are enforced to accomplish the same beneficent end, and not to promote collisions. Consequently, they have exceptions; and no party ought ever to be permitted to defend or excuse a plain error by invoking a general rule of navigation, when it is clear that the case falls within an admitted exception.

If two sailing ships are meeting nearly end on, so as to involve risk of collision, the statutory rule is that the helms of both shall be put to port, so that each may pass on the port side of the other; but if the lines of approach are parallel, and the approaching vessels are each to the starboard of the other, the effect of porting the helms of the vessels would be to render a collision more probable. Where one of two vessels is required to keep out of the way, the other is required, as a correlative duty, to keep her course; but the act of Congress, following the usages of navigation, provides that that rule shall be subject to certain reasonable and necessary qualifications. Special circumstances may exist in particular cases, rendering a departure from the rule necessary in order to avoid immediate danger; and the act of Congress, among other things, expressly provides that nothing in the statutory rules shall exonerate any ship from the consequences of the neglect of any precaution which may be required by the ordinary practice of seamen or by the special circumstances of the case. 13 Stat. 61.

Proceedings *in rem* were instituted by the owner of the steam-tug "William Goodnow," in the District Court, against the bark "Sunnyside," in a cause of collision civil and maritime, in which the libellant claimed damages for injuries received by the steam-tug in a collision that took place in Lake Huron on the 14th of June, 1869, between the steam-tug and the bark, about fifteen minutes past three o'clock in the morning, by which the steam-tug was sunk in the lake.    Though sunk in the lake, yet she was subsequently raised and towed to Detroit, and was there repaired; the expense of repairing her, including the cost of raising her, amounting to nine thousand five hundred dollars. Damages are also claimed for demurrage in the sum of three thousand six hundred dollars, amounting in the whole to the sum of thirteen thousand and one hundred dollars.

Service was made, and the owner of the bark appeared as claimant, and made answer to the libel, and filed a cross-libel, charging that the collision was occasioned solely by the negligence, unskilfulness, and carelessness of the persons navigating the steam-tug, and claiming damages for injuries received by the bark in the collision.    Witnesses were examined on both sides; and, the parties having been fully heard, the District Court entered a decree that the bark and the tug were equally in fault in bringing about the collision, and that the loss and damage accruing to the two vessels be apportioned between them in equal moieties, and referred the cause to a commissioner to assess and report the amount.

Suffice it to say, that the report of the commissioner, made in pursuance of the decretal order, gave the sum of seven thousand three hundred and fifteen dollars and fifty-one cents to the owner of the steam-tug, the libellant in the principal case.

Exceptions were filed by the respondent, some of which were sustained, and others were overruled; and the record shows that the District Court entered a final decree for the libellant in that suit of four thousand seven hundred and twenty-four dollars and nine cents, together with costs of suit.    Whereupon the respondent in the principal suit, and libellant in the cross-libel, appealed to the Circuit Court for that district.

Sufficient appears to warrant the conclusion that the evidence was the same in the Circuit Court as in the District Court.    Both

parties were again heard in the Circuit Court; and the Circuit Court reversed the decree of the District Court, and entered a decree for the libellant in the cross-libel, and dismissed the libel in the suit instituted by the owner of the steam-tug. Instead of holding that both vessels were in fault, the Circuit Court decided that the steam-tug was wholly in fault; and the libellant in the principal suit appealed to this court, and now seeks to reverse that decree.

Much difference of opinion respecting what took place just before and at the time of the collision cannot exist, as most of the material facts are either conceded, or so fully proved, that much discussion of the evidence, save in a single particular, is rendered unnecessary. Avoiding immaterial details, the facts may be stated as follows: —

That the steam-tug lay in the lake, three miles from the shore, near the head of St. Clair River, with her white and colored lights burning, waiting for a tow, in conformity to a well-known usage with such steamers plying in those waters. By the evidence, it also appears that the steam-tug was heading east by north half north; that the night was clear, and that the morning had so far dawned that such a vessel could be seen, even without lights, from one and a half to two miles by another vessel approaching from a north-easterly direction; that the bark was coming up the lake, on her way from Erie to Chicago, laden with coal, under a wholesail breeze, and was heading north half west. Beyond all doubt, she had plenty of sea room on each side; and the evidence shows that she had all her sails set, including her studding-sails, and that she was moving through the water at a speed of nine miles an hour.

Preceding the collision, the steam-tug had for several hours been lying with her machinery stopped, waiting for a tow, which those in charge of her expected to find, as vessels passed up or down the lake on that route. Steam-tugs waiting there for such employment remain as nearly stationary as possible, without coming to anchor. Of course, the vessels are liable to drift before the wind; and the evidence in this case shows that the wind was south-west, and that the steam-tug drifted at the rate of a mile or a mile and a half per hour, though all of her machinery was stopped, and she had her "rudder lashed to the

starboard," and her signal-lights burning, as required by law, when in motion.

Both courts below came to the conclusion that the steam-tug did not have a competent lookout; and the court here is of the same opinion, even if the testimony of the mate is entitled to full credit. All agree that it was the mate's watch. He admits that his attention was called to the lights of the bark when she was quite distant; and he states to the effect, that, not being able to see very well where he was standing, he started forward; that, when he got about midships, he saw the jib-boom of the bark coming over the steam-tug just forward of the pilot-house, which was just before the collision occurred; and it appears that the steam-tug sunk in fifteen or twenty minutes after the two vessels came together.

Throughout the period, from the time the attention of the mate was called to the lights of the bark to the time of the collision, it does not appear that either he or the lookout made any effort to ascertain the situation or course of the approaching vessel, except that the mate started to go forward just before the steam-tug was struck by the bark. When his attention was called to the lights of the approaching vessel, both he and the lookout were aft; and it does not appear that the lookout even started to go forward after he had notified the mate that lights were approaching, nor that he did any thing else in the line of his duty, nor was he examined as a witness in the case.

Damages for the entire injuries received by the bark are claimed by her owners, not only on the ground that she was without fault, but on the further ground that the steam-tug, having been without a competent lookout, is liable in the Admiralty Court for all the loss or damage which the bark sustained.

Errors committed by one of two vessels approaching each other from opposite directions do not excuse the other from adopting every proper precaution required by the special circumstances of the case to prevent a collision; as the act of Congress provides, that, in obeying and construing the prescribed rules of navigation, due regard must be had to the special circumstances rendering a departure from them neces-

sary in order to avoid immediate danger. 13 Stat. 61; *The Maria Martin*, 12 Wall. 47; *The Lucille*, 15 id. 679.

Steamboats and propellers navigating the Northern and Western lakes during the night were required to show signal-lights of a prescribed character fifteen years before the passage of the act applying rules and regulations in that regard to the navy and the general mercantile marine of the United States. 9 Stat. 382. Subsequent to the passage of that act, a disastrous collision occurred on Lake Erie between the steamer "Atlantic" and the propeller "Ogsdenburg," each charging the other with fault; and it appeared on appeal here that the propeller did not show the prescribed signal-lights, in consequence of which it was insisted by the owners of the steamer that the propeller was liable for all the loss and damage sustained by the steamer. Attempt was made to maintain that proposition, in view of the language of the act of Congress requiring such steam-vessels to show signal-lights; but this court held otherwise, and remarked to the effect following: —

Such is not the language of the section; and we think the construction contended for would be both unwarranted and unreasonable. Owners of the vessels named in that section are made liable for the consequences resulting from their own acts, or from the acts of those intrusted with the control and management of their own vessels, and not for any damage resulting from the misconduct, incompetency, or negligence of the master or owners of the other vessel. They are made liable for their own neglect, and not for the neglect of the other party.

Failure to comply with the statutory regulations, in case a collision ensues, is declared to be a fault, and the offending party is made responsible for all the loss and damage resulting from the neglect; but it is not declared by that section, or by any other rule of admiralty law, that the neglect to show signal-lights on the part of one vessel discharges the other, as they approach, from the obligation to adopt all reasonable and practicable precautions to prevent a collision.

Lights of the kind are required by law; and the absence of them, in cases falling within the prescribed regulations, renders the vessel liable for her neglect; but it does not confer any

right upon the other vessel to disregard or violate any rule of navigation, or to neglect any reasonable and practicable precaution to avoid the impending danger which the circumstances afford the means and opportunity to adopt. Steamers displaying proper signal-lights are, in that respect, without fault; but they have other duties to perform to prevent collisions besides complying with that requirement, and their obligations to perform such other duties remain unaffected by any thing contained in that act of Congress.

Vessels of the kind are required to show signal-lights, in order that each may be seen by the other in time to adopt reasonable and necessary precautions to prevent the loss of life and property by collisions; but if one has such lights, and the other has not, yet if the one having such lights actually sees the other vessel as she approaches in ample season to avoid the collision, and neglects to take any proper precaution to prevent it, and it ensues, it cannot be said in such a case that all the loss and damage resulted from the neglect of the vessel without signal-lights, as the collision might have been prevented, and, but for the negligence and omission of duty on the part of those in charge of the other vessel, would never have occurred.

Enforced by those reasons, this court decided in that case that the neglect of the propeller to show signal-lights did not vary the obligations of the steamer to observe the rules of navigation, and to adopt all such reasonable and necessary precautions to prevent the collision as the circumstances in which she was placed gave her the opportunity to employ. *Chamberlain* v. *Ward*, 21 How. 567.

Apply the foregoing rules of decision to the case before the court, and it is clear that the important question remains to be considered, whether the bark was or was not also in fault; for, if she was, the rule is well settled by the repeated decisions of this court that the damages should be divided between the offending vessels. *The Catharine*, 17 How. 170; *The Morning Light*, 2 Wall. 557; *Union Steamship Co.* v. *Steamship Co.*, 24 How. 313.

Where the collision occurs exclusively from natural causes, and without any fault on the part of the owner of either vessel

or those intrusted with their control and management, the maritime rule, as defined by the Federal courts, is, that the loss shall rest where it falls, on the principle that no one is responsible for such a disaster when produced by causes over which human skill and prudence can exercise no control.

Admiralty courts everywhere have now adopted that rule: but it cannot be applied where either or both of the vessels are in fault; as, where the vessel of the respondent is alone in fault, the libellant is entitled to a decree for his damages. The converse of the proposition is equally true, that, if the vessel of the libellant is alone in fault, the proof of that fact is a sufficient defence to the libel; but if both vessels are in fault, then the damages must be equally apportioned between the offending vessels. *The Continental*, 14 Wall. 355.

Reciprocal faults were charged in that case; but the Circuit and District Courts decided that the propeller was wholly in fault, because she did not show proper signal-lights; the theory being, that the failure of the propeller to display proper signal-lights misled the steamer as to the true character of the approaching vessel. On the other hand, the charge against the steamer was, that she put her helm to starboard instead of porting, as required by the rules of navigation.

Satisfactory proof having been given to make good the charge against the steamer, the court here reversed the decree of the Circuit Court, and gave directions that the damages should be divided.

Absence of proper signal-lights in such a case, say the court, renders the owners liable for the consequences resulting from the omission; but it does not confer any right upon the other vessel to disregard or violate any rule of navigation, or to neglect any reasonable or practicable precaution to avoid a collision which the circumstances afford the means and opportunity to adopt. Navigators often have other duties to perform to prevent collisions besides displaying signal-lights; and if they neglect to perform such other duties, and a collision ensues in consequence of that neglect, they will not be held blameless because they displayed the signal-lights required by law. *The Gray Eagle*, 9 Wall. 511.

Evidence of the most satisfactory character is exhibited in

the record that the lights of the steam-tug were seen by the lookout of the bark and by the officer of the deck when the two vessels were nearly or quite two miles apart. Beyond controversy, it was the lookout of the bark who first discovered the lights: but it is beyond dispute that he immediately reported to the mate, as the officer of the deck, that there was a light ahead, a little on the port bow; which is fully confirmed by the testimony of the mate, who states, that, when the lookout sang out that there was a light ahead, he ran forward to the lookout, who was stationed on the top-gallant forecastle, in the forward part of the vessel.

Taking his account of what transpired as true, all he did was to look briefly at the light, and to remark to the lookout that he supposed it was a steamer, adding that he guessed she would take care of herself, and returned aft, apparently unconcerned, to look after other lights. He admits that he gave no order to the wheelsman, and that he heard nothing further of the steam-tug until the lookout sang out that the light was close under the bow of the bark.

Without stopping to state what the mate did or attempted to do in that emergency, it may be well in the first place to ascertain what, if any thing, the lookout did to ward off the impending peril, after the officer of the deck returned aft when first summoned and shown that there were lights ahead. Lookouts are expected to obey the officer of the deck; and all experience shows that seamen acting in that capacity are more or less vigilant as the orders or conduct of the officer in charge of the deck seem to require. Indifference in respect to an approaching light, such as that manifested by the mate, was not calculated to induce much vigilance on the part of the lookout; and his own testimony shows that his services in that regard, after the mate left the forecastle and returned aft, were of no value whatever. What he says is, in effect, that the steam-tug showed her green and bright lights, that she appeared to be heading to the eastward, but that he could not tell whether she was in motion or not; and he admits, that, after the mate said he guessed she would take care of herself, he paid no attention to her until he saw her close under the jib-boom of the bark, when the steam-tug appeared to be drifting.

Hurry, confusion, and alarm followed, as is obvious from the testimony of the mate. When the lookout gave the second warning, the mate testifies that he shouted to the man at the wheel, " Hard up!" that he shouted as he ran from where he was standing, fifteen feet abaft the mainmast, a distance of eighty or ninety feet to the top-gallant forecastle, where the lookout was: but he admits that the order was too late to be of any avail; that the vessel had then no time to swing off; that the collision was inevitable; and that the bark struck the steam-tug on her starboard side, forward of the pilot-house. Haste then was useless; and there can be no doubt that what the mate finally says is true, that there was nothing then that could have been done on their part to avoid the collision.

Negligence more manifest, culpable, or indefensible, in view of the circumstances, is seldom exhibited in controversies of this character; and the only excuse offered for it is, that the eighteenth sailing rule provides, that, where one of two ships is required to keep out of the way, the other shall keep her course; entirely overlooking the fact that the mandate of that rule is declared by the rule itself to be subject to the qualification, that, in obeying and construing the rule, due regard must be had to all dangers of navigation and to any special circumstances which may exist in any particular case, rendering a departure from the rule necessary in order to avoid immediate danger.

Years before the act of Congress referred to was passed, this court promulgated the doctrine, that rules of navigation are adopted to prevent collisions, and to save life and property at sea, and not to promote such disasters; and decided that the neglect of one of two approaching vessels to show the signal-lights required by law did not vary the obligations of the other to observe the rules of navigation, and to adopt all such reasonable and necessary precautions to prevent the collision as the circumstances in which she was placed gave her the opportunity to employ. *Steamship* v. *Rumball*, 21 How. 383; *Chamberlain* v. *Ward*, id. 568.

Reasonable doubt cannot, we think, be entertained, that Congress in enacting the sailing rules intended to promote the same objects by substantially the same requirements; for which there

is abundant confirmation in art. 20 of the sailing rules, which is as follows: " Nothing in these rules shall exonerate any ship, or the owner, master, or crew thereof, from the consequences of any neglect to carry lights or signals, or of any neglect to keep a proper lookout, or of the neglect of any precaution which may be required by the ordinary practice of seamen or the special circumstances of the case." 13 Stat. 61.

Leave was granted to the libellant in the District Court, to amend the libel; and he amended the fourth article of the same to the effect following: That the steam-tug was lying motionless upon the water, out of the track of vessels going up and down the lake; that the bark had no competent lookout properly stationed on the vessel; that the collision was occasioned by the neglect of the officers and crew of the bark to see the steam-tug, or to discover that she was not in motion in season to take any steps to prevent the collision.

Vigilance as well as experience is required of a lookout; and, if he is inattentive to his duty, it is no sufficient excuse to say that he was competent to perform the required service. No doubt the bark had a lookout; and the evidence tends to prove that he was competent, but his own testimony shows conclusively that he did not properly perform his duty after the mate came forward and returned aft. He admits that he could not tell whether, at that time, the steam-tug was stationary or in motion; and he must have known that the mate left the forecastle and went aft as ignorant upon the subject as he himself was.

Suppose that was so (and there is no apparent reason to doubt it), then it was his plain duty, the moment he ascertained that the lights ahead were stationary, to have reported that fact to the mate as the officer of the deck. Steamers in motion, the mate might think, would take care of themselves; but the lookout could not know what the mate would think if he should be informed that the lights were stationary.

Lookouts, as he supposes, are not required to report the same light a second time; though he admits it might become the duty of a lookout to do so in case the circumstances were materially changed. He did not make a second report in season to be of any avail, except, perhaps, to arouse the mate to a consciousness

of his prior neglect in not making some effort to ascertain whether the lights ahead were stationary or in motion.

Whether a second report before the collision became inevitable would have dispelled the feeling of security manifested by the mate cannot be known; but it is clear that no such second report was made in season to enable the mate to adopt any effectual precaution whatever; and the only excuse the lookout offers is what the mate remarked when the first report was made, that it was a steamer, and that he guessed she would take care of herself. Beyond all question, the steam-tug was left to take care of herself until the moment the collision occurred, when neither the shouting nor the hurried orders of the mate could prevent the disaster.

Culpable misconception as to his duty on the part of the mate, and inattention and carelessness on the part of the lookout, induced, perhaps, by the remarks of the mate that it was a steamer, and that she would take care of herself, were the primary causes of the neglect and omission of duty which led to the collision. Substantially the same view of the facts was taken by the district judge; and he decided that the rule, that, when a sailing vessel and a steamship are proceeding in such directions as to involve risk of collision, the steamship shall keep out of the way of the sailing ship, and that the sailing ship shall keep her course, do not excuse the sailing ship from the observance of ordinary care in her navigation, nor from the use of such means as may be in her power to avoid a collision in case of immediate danger, even though that danger may have been made imminent by the non-observance of duty on the part of the steamship.

Authorities were cited by the district judge in support of his proposition; and he also adverted very fully to the evidence showing what took place between the mate and the lookout, and then remarked that the mate then left the forecastle and went to another part of the vessel to watch some lights at the leeward of the bark, and paid no further attention to the lights of the steam-tug; and proceeds to say, — what is fully supported by the testimony, — that from that time the lights of the steam-tug were not reported by the lookout, nor was any watch kept or notice whatever taken of them on board the

bark until the lookout saw and reported that the steam-tug was right under the bows of the bark, and a collision was inevitable.

Throughout it should be observed that the lights of the steam-tug were seen by the lookout and mate of the bark when the two vessels were from a mile and a half to two miles apart, and that the speed of the bark did not exceed nine miles an hour.

Viewed in the light of the circumstances, it is obvious that the mate and lookout of the bark had abundant time to have determined whether the steam-tug was in motion, or only drifting, if they had used common care and ordinary vigilance in that regard, as they were bound to do; nor would there have been any difficulty in avoiding the collision, if proper precaution had been seasonably adopted for that purpose; and, inasmuch as no such precaution was taken by those in charge of the deck of the bark, it follows that she also is in fault, and must answer for her fair proportion of the loss occasioned by the collision, as the fault of the steam-tug does not excuse the fault of the bark, if the latter was in any substantial degree a contributory cause of the collision. *The Adriadne*, 13 Wall. 479.

Due appeal was taken to the Circuit Court; and the circuit judge reversed the decree of the District Court, and determined that the bark was without fault, deciding, among other things, that the officer in charge of the deck of the bark, having once observed the light ahead, had full authority to act upon the assumption that the steam-tug would keep out of the way; and he also ruled, that if a light in such a case is reported to an officer in charge of a vessel required by the rule to keep her course, and, from full observation, the unambiguous, apparent condition, in reference to wind, atmosphere, course, distance, and character of the vessel, all indicate absolute safety, if the rule of the road is complied with, he may leave the future watching of such a light to an experienced lookout, and that it will not be a fault if he does not himself remain with the latter, and participate in his observation.

Even suppose that can be admitted, it is difficult to see how the admission can in any way benefit the bark, as the bark is responsible for the negligence of her lookout as well as the

officer in charge of her deck; and the circuit judge states that the lookout testified that he did perceive that the steam-tug was at rest, and he adds that the fact is too apparent to admit of discussion.

All admit that steamships engaged in navigation are to keep out of the way of sailing ships when the two are proceeding in such directions as to involve risk of collision; and that the sailing ship under such conditions is to keep her course, subject to the qualifications contained in art. 19 of the sailing rules, and subject to the obligation applicable to all ships under way, which is ordained in the twentieth article of the same rules, that nothing contained in those rules shall exonerate any ship from the consequences of the neglect of any precaution which may be required by the ordinary practice of seamen or by the special circumstances of the case.

Doubts may well be entertained whether the bark did keep her course with such exactness as is supposed by her owners. Both parties assume that the steam-tug was drifting eastward from one and a half to two miles an hour, and that the bark, when the lights of the steam-tug were first seen by the lookout and mate, was heading north half west. None of the witnesses pretend that the speed of the bark exceeded nine miles an hour; and the proof is full to the point that the lights of the steam-tug, when first seen from the bark, bore less than a half point over the port bow of the bark, and that she struck the steam-tug square on her starboard side, forward of the pilothouse.

Tested by these conceded facts, it is almost past belief that the bark maintained her course of north half west from the time the lights of the steam-tug were first seen to the time of the collision; but we prefer to rest the decision upon the ground that it was the duty of the bark, in view of the special circumstances, to have put up her helm and have gone to the right, or to have put it down and suffered the steam-tug to have drifted past in safety.

Cases arise in navigation where a stubborn adherence to a general rule is a culpable fault, for the reason that every navigator ought to know that rules of navigation are ordained, not to promote collisions, but to save life and property by preventing

such disasters. In general, says Mr. Parsons, established rules and known usages should be carefully followed; for every vessel has a right to expect that every other vessel will regard them, but not where they will, from peculiar circumstances, certainly cause danger; as if a vessel, near a rock or shore, must strike it by putting her helm to port, which the general rule might require: and he adds, that "no vessel is justified, by pertinacious adherence to a rule, for getting into collision with a ship which she might have avoided;" which is the exact case before the court. 1 Pars. Ship. and Ad. 580.

Decided cases to support that proposition are very numerous, besides those to which reference has already been made, as will be seen by referring to the same page of the treatise just cited.

It must be remembered, says Mr. Justice Curtis, that the general rule is for a sailing vessel meeting a steamer to keep her course, while the steamer takes the necessary measures to avoid a collision; and though this rule should not be observed when the circumstances are such that it is apparent its observance must occasion a collision, while a departure from it will prevent one, yet it must be a strong case which puts the sailing vessel in the wrong for obeying the rule; for the court must clearly see, not only that a deviation from the rule would have prevented the collision, but that the officer in charge of the sailing ship was guilty of negligence or a culpable want of seamanship in not perceiving the necessity for a departure from the rule, and for acting accordingly. *Crocket* v. *Newton*, 18 How. 583.

Sailing vessels on the larboard tack and close-hauled are, in general, required to keep their course; but Dr. Lushington held that such a vessel is not justified in pertinaciously keeping her course, even though the vessel she meets is on the starboard tack, and with the wind free. Where practicable, said that learned judge, such a vessel is bound to take the necessary precautions for avoiding the collision, although the other vessel is acting wrongfully in not giving way in time; and in that case he held that both vessels were in fault. *The Commerce*, 3 W. Rob. 287; *Handaysyde* v. *Wilson*, 3 Car. & P. 530.

Reasonable care and vigilance would have enabled the mate as well as the lookout to have perceived that the steam-tug was

not in motion, and they cannot be excused for their negligence merely by the fact that the steam-tug showed the lights required to be displayed by a steamer under headway; nor are the owners of the same estopped from showing what the special circumstances were because she showed such lights. Navigators know that the rule requiring steamers to keep out of the way of sailing ships, and which require sailing ships to keep their course, apply to vessels in motion, and not to a vessel at anchor, nor to one which is lying fastened to the wharf; nor do they apply to a vessel going about in stays, if it appears that she was properly put in stays, for the reason that such a vessel for the time being is almost as helpless as a vessel at anchor. *The Nymph*, Lush. 23.

Due care and caution should be used by steam-tugs lying with their helms lashed waiting for employment; but approaching vessels have no right to regard them as mere obstructions to commerce, nor as fit objects to be run down with impunity. Persons navigating the seas or lakes have no right to cast themselves upon such vessels, as upon an obstruction which has been made by the fault of another, and then avail themselves of it for any defensive purpose, unless they show that they themselves used common and ordinary caution to be in the right. *Butterfield* v. *Forrester*, 11 East, 60; *Farnum* v. *Concord*, 2 N. H. 393.

Admiralty courts everywhere hold that a sailing vessel should keep her course when a steamer is approaching, so as to involve risk of collision, unless the case is such as clearly to bring it within the qualifications and exceptional special circumstances contained and described in the nineteenth and twentieth articles of the sailing rules; but where no dangers of navigation prevail, nor any exceptional or special circumstances are shown, the general rule must be applied, as appears by all the standard authorities. *The Warrior*, Law Rep. 3 Ad. & Ecc. 555.

*Decree of the Circuit Court reversed, and the cause remanded with directions to enter a decree affirming the decree of the District Court.*