AMERICAN S. S. CO.

v.

INTERLAKE S. S. CO.

No. 63, Docket No. 22803.

United States Court of Appeals,
Second Circuit.

Argued Nov. 5, 1953.

Decided Dec. 4, 1953.

Rehearing Denied Jan. 5, 1954.

Richards & Coffey, Buffalo, N. Y. (Laurence E. Coffey and James P. Heffernan, Buffalo, N. Y., of counsel), for appellant.

Arthur E. Otten, Buffalo, N. Y., Arter, Hadden, Wykoff & Van Duzer, Cleveland, Ohio (Carl A. Schipfer, McAlister Marshall and Robert G. McCreary, Jr., Cleveland, Ohio, of counsel), for appellee and cross-appellant.

Before CHASE, Chief Judge, CLARK, Circuit Judge, and BRENNAN, District Judge.

CHASE, Chief Judge.

About ten minutes before four o'clock in the morning of October 17, 1951, when the weather was clear, the wind negligible, and the moonlight ample for good visibility a collision occurred between two lake steamers in the St. Clair River between Port Huron, Mich., and Sarnia, Ont., one being the George F. Rand owned and operated by the appellant American Steamship Company and the other the Harvey H. Brown owned and operated by the cross appellant, The Interlake Steamship Company. Suits by each owner against the other resulted in an interlocutory decree holding both vessels at fault and dividing the damages. Both owners have appealed. The evidence supports findings which may be sufficiently summarized as follows:

Both vessels were bulk carriers with an overall length of 550 feet, a keel length of 532 feet, and a beam of 58 feet. The Rand was a self-unloader carrying 4002 tons of sand and her draft was 17 feet, 11 inches forward and 18 feet, 2 inches aft and the Brown, loaded with coal, had a draft of 19 feet, 4 inches forward and 20 feet aft.

The Rand had unloaded part of her cargo of sand at the Government Dock at Sarnia, Ont., and having backed away from the dock, had come to a position where her stern was about abreast of Bay Point Light where she was headed south when her engines were put full speed ahead to enable her to swing to her right into the river to complete her voyage to Toledo, Ohio. She then saw

the Brown coming up the river in the upbound channel below the Port Huron traffic buoy which was about four-fifths of a mile below Bay Point Light. The Brown had seen the Rand backing away from the dock and, mistaking her for a Canadian boat, had unsuccessfully tried to call her by radio telephone by such description. However, just as the Rand was going out into the river the Brown called her by a correct description and asked what she intended to do. The Rand replied that she was going into the river at full speed and would meet the Brown on the one whistle side. To that the Brown replied, "O. K., one whistle side." Shortly thereafter and when the stern of the Rand had just cleared a flashing red light near the southwest corner of the government slip the Rand gave a one blast signal which the Brown answered with the same signal. Thus by the time the Rand entered the river and when the Brown was closely approaching the Port Huron traffic buoy the vessels had agreed to a port to port passing. But as the Rand was then leaving Sarnia on the Canadian shore both knew that to get into position to make such a passing the Rand would first have to cross ahead of the Brown in the upbound channel.

To do that, the Rand cleared the flashing red light at 3:45 a. m. her engine room time and at full speed went out into the river where there was a channel navigable by such a vessel some twelve hundred feet wide which rather gradually fanned out to the south to something like twice that at the Port Huron traffic buoy. She encountered a southeasterly current in the river of about four miles an hour and, keeping her engines at full speed ahead, started across the river on a heading maintained for four minutes generally at an angle of about 45 degrees with the American shore. The maximum speed she reached was not more than six miles an hour and during the four minutes she had failed to get wholly across the upbound channel. She reversed her engines, but failed to stop her headway, just before

the vessels collided above the Port Huron traffic light to the Canadian side of the middle of the river. They came together at an angle of between 80 and 90 degrees with the stem of the Brown going into the port side of the Rand at her No. 7 hatch about 175 feet aft of the bow. When the vessels cleared, the Brown swung to her port and went back down the river on the Canadian side of the Port Huron traffic buoy. The Rand went across the downbound channel and was beached on the American side.

The Brown had, after exchanging the one-blast signals with the Rand, continued her course up the upbound channel for some 400 feet. She could have continued on closer to the Canadian side of the channel and then could have hauled enough to the left to have kept clear of shoal water there and still had room to pass under the stern of the Rand. But instead she went to her left when her stern was about abreast of the traffic buoy where it was usual for upbound vessels to do so and continued her left swing right up to the time of collision, having put her engines at half speed five minutes before the vessels struck and one minute later stopped them. Two minutes later they went full astern and for the last minute before the collision her by-passes were opened to give her more power.

After the agreement for a port to port passing had been made each vessel had the other in plain sight and neither gave any additional signals.

Under these circumstances it is plain enough that the fault of the Brown was a contributing cause of the collision. Not only was the Rand given the right of way by Pilot Rules 18 and 24, Chap. 4 of Title 33 U.S.C.A., but it was her duty under the rule to signal her election before the vessels were within one-half mile of each other as to which side of the channel she would take. She did so and the Brown agreed. Thus Pilot Rules 18 and 24 bound the Brown to keep out of the Rand's way and to do that if necessary, by slackening her, or by stopping, or reversing. Pilot Rule

21. The Brown was bucking what current there was and her ability to hold back to keep out of the way of the Rand is obvious, but though she did slacken speed and did reverse she did not do so soon enough and fast enough, in view of her swing so soon and so far to the left, to "keep out of the way" of the Rand. She had been advised by the Rand that that vessel would go into the river under full speed ahead and during the four minutes the Rand had been navigating in plain sight the Brown as the giving way vessel could see where her course and speed were taking her. She was bound to navigate in the light of what she should reasonably have expected the position of the Rand would be as the vessels came into close quarters on the assumption that the Rand was on her course at full speed and would so continue. Clyde-Mallory Lines v. New York Central R. Co., 2 Cir., 83 F.2d 158, 160. She failed to take the timely and effective action required of the burdened vessel to hold back out of the way, and was correctly held at fault for such failure. The Breakwater, 155 U.S. 252, 15 S.Ct. 99, 39 L.Ed. 139; The Cranford, 2 Cir., 27 F.2d 710; Commonwealth & Dominion Line v. United States, 2 Cir., 20 F. 2d 729.

Nor was the Rand free from fault which was also a contributing cause of the collision. We do not base this conclusion on any lack of sound judgment in leaving the slip at Sarnia as her captain did when the Brown was below the Port Huron traffic buoy though the trial judge was not without basis in the evidence for holding that to be faulty navigation. Having done so, the Rand did hold her course and speed in literal compliance with Pilot Rule 20. While that may be usually the measure of the duty of the vessel having the right of way there is no privilege to navigate so as to make collision practically inevitable. Having proposed, and received the Brown's agreement, to a port to port passing it was incumbent upon the Rand to carry out her part of the agreement by getting over toward, or into, the downbound channel soon enough to let a port to port passing situation develop in time to make that a reasonably safe one. However, instead of taking a heading which would have brought her quickly and safely into such a position she took a heading which, when the force and direction of the current are considered, brought her only very gradually toward the downbound channel. It was apparent that as the Brown came around on a constant swing to her left above the traffic buoy the Rand was still so blocking the upbound channel that the risk of collision was great and imminent. The Rand was charged with an ever-increasing awareness that her adherence to the course originally selected would take her into collision with the Brown and that she would have either to direct her course much more to starboard or slow or stop to avoid one. Despite her privileged position she had no privilege to keep on into inevitable collision. Sec. 90.10 of Title 33 C.F.R.; Cf. Postal S. S. Corp. v. El Isleo, 308 U.S. 378, 60 S.Ct. 332, 84 L.Ed. 335.

In Morrow S. S. Co. v. The Daniel J. Morrell, D.C., 90 F.Supp. 300, affirmed, Cambria S. S. Co. v. Morrow S. S. Co., 6 Cir., 182 F.2d 347, and in The Mary C. Elphicke v. Pittsburgh Steamship Co., 6 Cir., 123 F. 405, the application of this principle is exemplified in situations so like this that for all practicable purposes the cases are identical and show that the Rand so navigated right into the teeth of collision that she cannot escape partial responsibility for it. Cf. The New York, 175 U.S. 187, 205, 20 S.Ct. 67, 44 L.Ed. 126; The Sunnyside, 91 U.S. 208, 222, 23 L.Ed. 302.

Decree affirmed.