In the Matter of Coastal Towing Corporation, as owner of the M/V FAY BLACKMAN, Praying for Exoneration from or Limitation of Liability.

COASTAL TOWING CORPORATION, Libellant-Appellee,

v.

The M/V EMILY JEAN, her engines, tackle, apparel, furniture, etc., Respondent, Lincoln Boat Corporation, Respondent-Appellant.

No. 27594.

United States Court of Appeals, Fifth Circuit.

Jan. 15, 1971.

Rehearing Denied March 24, 1971.

Francis Emmett, Benjamin W. Yancey, New Orleans, La., for appellant. Terriberry, Carroll, Yancey & Farrell, New Orleans, La., of counsel.

Charles E. Dunbar, III, John Poitevent, New Orleans, La., for appellee; Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, La., of counsel.

Before JONES, BELL, and GODBOLD, Circuit Judges.

GODBOLD, Circuit Judge:

This case arises from the collision of two barge tows on the Mississippi River. A downbound tow powered by the motor vessel Emily Jean and an upbound tow powered by the motor vessel Fay Blackman collided in the vicinity of mile 404.-4, near Port Gibson, Mississippi. Two barges were destroyed, one was damaged, and two Fay Blackman crew members jumped overboard and were drowned. All third party claims against the vessels were settled and the proceeding in admiralty below was to determine whether the Emily Jean, the Fay Blackman, or both, were liable for the losses resulting from the collision. The Emily Jean appeals from an interlocutory decree holding her solely at fault and exonerating the Fay Blackman. We conclude that both vessels were at fault.

We shall set forth only so much of the facts as is necessary.[1] In the area where the collision occurred the Mississippi River is divided into two channels by a partially forested sandbar, known as Middle Ground Island. Under the conditions existing at the time of the collision the only navigable channel was the left descending channel, which lies between the island and the Mississippi State shore. Beginning upriver in the vicinity of Brooks Beam Light this navigable channel narrows appreciably. Approximately two miles downriver from Brooks Beam Light the island ends, and the channels from either side of the bar merge into a single wider channel. Looking downriver from Brooks Beam Light, the left descending (Mississippi) bank of the river makes a sweeping bend to the right approximately 1¼ to 1½ miles long. The bend terminates at a point or outcropping of the left descending bank into the river known as Big Black Point, on which is located Big Black Upper Light. From Big Black Point to the downriver end of Middle Ground Island the navigable channel is relatively straight.

In the two-mile stretch from Brooks Beam Light to the downriver end of the bar the narrowest point, and the swiftest current, occur at the termination of the bend, at Big Black Point, where the channel is 850–900 feet wide. In the bend from Brooks Beam Light to Big Black Point the current sweeps the bend, following the left descending bank. At the downriver end of the bend it strikes Big Black Point and sweeps at an angle across the river toward Middle Ground Island, leaving slack water below Big Black Point along the left descending bank.[2]

On the day of the collision the Emily Jean was downbound under clear daylight conditions, pushing four empty

1. A full recital appears in the District Court's Findings of Fact and Conclusions of Law (E.D.La.1968).

2. This condition creates what is known as a river crossing. Descending boats, attempting to follow the current, cross from one side of the channel to the other, while ascending boats, attempting to avoid the current, move from one point of land to another, thus crossing the channel in the opposite direction.

barges made up two wide and two long. The Fay Blackman was upbound, pushing two loaded barges in tandem. The Emily Jean tow, "sliding"[3] with the current in the bend along the left descending bank attempted to navigate out of the bend at Big Black Point and cross over towards the right descending bank (Middle Ground Island). The collision occurred in the vicinity of the point and near the left descending shore, with the Emily Jean tow angled across the channel and travelling at 12 to 14 miles per hour, and the Fay Blackman tow in the narrow waters off Big Black Point, making little or no forward progress. The forward port corner of the Fay Blackman's lead barge collided with the bow of the Emily Jean's port face barge.

The District Court found that prior to the time the two vessels sighted each other, when the Emily Jean was well above Brooks Beam Light and the Fay Blackman was some two miles below Big Black Point, the Emily Jean had agreed by radio that she would hold up above the bend and that the Fay Blackman was to keep driving ahead upriver. It found that the Emily Jean had continued downriver in violation of that agreement without recontacting the Fay Blackman, and had proceeded into the bend at full speed. It also found that upon sighting the Emily Jean the Fay Blackman called her and there occurred a second radio conversation in which the tows agreed to a port to port passing. It found that after this second conversation the Emily Jean continued to proceed downriver without reducing speed, lost control of her tow, and blocked the navigable channel ahead of the Fay Blackman.

The District Court found that after the second conversation the Fay Blackman reduced her speed to "mere steerageway" and held her tow parallel to and only a few feet off the left descending bank. It also found that upon perceiving that the Emily Jean was losing control of her tow the Fay Blackman reversed her engines, that at the moment of impact she was commencing to move astern, and that she was about 15 to 30 feet off the left descending bank of the river.[4] All of these findings are adequately supported by the evidence. None is clearly erroneous.[5]

The Emily Jean contends that in the second radio conversation the Fay Blackman agreed to hold up at Big Black Point, and that the master of the Emily Jean appropriately understood this to mean that the Fay Blackman would hold up below or under the point and give the Emily Jean the right of way through the narrow channel. The findings of the trial court do not specifically state that this alleged superseding agreement was not made, but such a finding is implicit, and a finding to the contrary is excluded by the findings that were made.[6] The evidence as to a superseding agreement was in direct conflict,

---

3. A downbound vessel "slides" through a bend when it follows the current, and, with its power on, turns the head of its tow in the direction that the current takes as the current comes out of the bend. This angles the tow across the channel.

4. There is no finding of how far apart the vessels were when the Fay Blackman reversed. It is undisputed that there was a third radio conversation shortly before collision, in which Emily Jean called Fay Blackman and told her that if she (Fay Blackman) were not backing the Emily Jean would hit her. Either Fay Blackman had just begun to reverse, or did so at once. Most of the evidence places the tows about one-quarter of a mile apart when this third conversation occurred.

5. McAllister v. United States, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20 (1954).

6. "8. Despite her radio agreement to hold up, the EMILY JEAN continued to come ahead without recontacting the FAY BLACKMAN by radio and without sounding a bend signal or any other signals, and when the head of the FAY BLACKMAN's tow was in close proximity to Big Black Light (MAHP 404.6) her navigator observed the tow of the EMILY JEAN proceeding downriver at full speed of 14–16 mph in the bend above Big Black Light. [References to transcript omitted.]

and the District Court was not required to make credibility choices in favor of the Emily Jean.

■ The District Court correctly held the Emily Jean at fault. Apart from any questions of statutory fault, it was a failure to exercise ordinary care for the Emily Jean to continue downriver into the bend after her original representation that she would wait above the bend for the Fay Blackman. But for this violation of the radio agreement, the collision would have never occurred. *See* Slade, Inc. v. Mississippi Valley Barge Line Co., 296 F.2d 188 (5th Cir. 1961).

■ The Emily Jean was guilty of statutory fault as well. The vessels were governed by the Navigation Rules for Western Rivers, 33 U.S.C.A. § 301 *et seq.*, as supplemented by the Pilot Rules for Western Rivers, 33 C.F.R. §§ 95.01 *et seq.* 33 U.S.C. § 346 (Rule 21, the Precautionary Rule) provides that

> Every steam vessel, when approaching another vessel so as to involve risk of collision, shall slacken her speed, or, if necessary, stop and reverse.

The District Court did not err in finding that the Emily Jean's failure to slow and to proceed cautiously upon first sighting the Fay Blackman was a violation of this section. The Emily Jean was travelling at full speed with the current, 12 to 14 miles per hour. By the testimony of her own personnel she was aware that her contemplated course would require her to pass in close proximity to Big Black Point and to the Fay Blackman, and at no time did she attempt to slacken her speed, even before she came close to the end of the bend. This situation involved a risk of collision, and "it is the risk of collision, not the collision itself, that masters must avoid." Ocean S.S. Co. of Savannah v. United States, 38 F.2d 782, 784 (2d Cir. 1930).

As to the Fay Blackman, the District Court erred in its applications of 33 U.S.C. § 346 (Rule 21) and the Narrow Channel Rule, 33 C.F.R. 95.11.[7] Emily Jean was in the bend, proceeding downriver at full speed, when first seen by the Fay Blackman. We turn to consideration of the interplay of two critical issues not precisely decided by the District Court—where is the downriver terminus of the narrow channel and where, in relation to this terminus, was Fay Blackman when she first saw Emily Jean? The imprecise finding of the District Court is that at the time of sighting Emily Jean the head of Fay Blackman's tow was in "close proximity" to Big Black Light.[8]

---

"9. Upon sighting the EMILY JEAN the navigator of the FAY BLACKMAN again contacted the navigator of the EMILY JEAN by radio. [References to transcript omitted.]

"10. During this second radio conversation the navigator of the EMILY JEAN did not explain why he had entered the bend contrary to his prior agreement to hold up above the bend but advised he was continuing ahead and there was sufficient channel to safely effect a port to port passage. As the EMILY JEAN was already in the bend the FAY BLACKMAN agreed to such a passage. [References to transcript omitted.]"

7. "When two steam vessels are about to enter a narrow channel at the same time, the ascending steam vessel shall be stopped below such channel until the descending steam vessel shall have passed through it; but should two steam ves- sels unavoidably meet in such narrow channel, then it shall be the duty of the pilot of the ascending steam vessel to make the proper signals, and when answered the ascending steam vessel shall lie as close as possible to the side of the channel and either stop the engines or move them so as to give the boat only steerageway; and the pilot of the descending steam vessel shall cause his steam vessel to be worked slowly until he has passed the ascending vessel."

8. The proposed findings of counsel for Fay Blackman were entered by the court without change.

The testimony, including that of her pilot, appears to us to show that the Fay Blackman was below the point when she sighted the Emily Jean. But we need not make this the basis of our decision.

First, we consider the possibility that Fay Blackman was below Big Black Point when she observed Emily Jean already in the bend. If the down-driver terminus of the narrow channel is at the point, then Fay Blackman was outside the channel and, as the ascending vessel, was required by the first clause of the Narrow Channel Rule to halt below the point and wait until the descending Emily Jean had passed out of the narrow waters.[9] This Fay Blackman did not do. Also a subsequent entrance by Fay Blackman into the narrow channel would be "avoidable" and not within the terms of the second clause of the rule.[10] Bearing in mind that the purpose of the rule is to prevent the maturation of situations which may lead to collisions—by keeping an ascending vessel out of a narrow channel (first clause), and controlling its movements where both vessels are in the narrow channel (second clause)—it would be wholly anomalous to hold that the ascending vessel is relieved of her obligation to refrain from entering a narrow channel simply because the descending vessel's presence in the channel, which is known to the ascending vessel, is the result of earlier failure by the descending vessel to exercise care.

On the other hand, if Fay Blackman was below the point when she first observed the Emily Jean, but the narrow channel is considered to extend downriver to the end of Middle Ground Island, then Fay Blackman already was unavoidably in narrow waters at the moment of sighting and was bound under the second clause of the rule to lie "as close as possible to the side of the channel" and either stop the engines or move them so as to give the boat only steerageway. There was a position of safety at hand, at the side of the channel and close to the Mississippi shore, in the slack waters underneath the point. A vessel lying in that position is outside the river crossing at the point, outside the swift current, and protected by the land mass of the point from downbound vessels which follow the sweep of the current from the Mississippi side to the island side. Fay Blackman could not comply with the obligation cast on her by simply continuing ahead and entering the narrowest bottleneck of the channel at the point, into or close to the cross-river sweep of the current, and then lying close to the point.

Second, we consider the possibility that when she first saw the Emily Jean the Fay Blackman already was in the narrowest stretch of water opposite the point, so that she was unavoidably within what is, under any construction, the narrow channel. In that event her subsequent actions do not comply with § 346 (Rule 21). The two vessels talked by radio (the second radio conversation). The pilot of the Fay Blackman agreed to "steer near the point" and to "try to hold up on the point" and the two vessels agreed to a port to port passing. The testimony conflicts as to whether she continued to move ahead or merely maintained her position, but this is not determinative. Whether moving ahead slowly or merely holding, she end-

9. The fact that Emily Jean already was in the narrow channel would make no difference. A descending vessel already in the channel and an ascending vessel outside the channel would be an *a fortiori* case of fault.

10. The District Court discussed the issue of avoidability in considering the duties put on the descending vessel by the last clause of the rule. The court focused on the actions of the Emily Jean alone, and either considered irrelevant or of little import the actions of the Fay Blackman. Thus in Conclusion of Law 6, it held

"The navigator of the EMILY JEAN testified he did not believe Title 33, Section 95.11 was applicable because the tows of the EMILY JEAN and the FAY BLACKMAN did not meet 'unavoidably', in the narrow channel where the collision occurred. This is a defense the Court rejects, particularly since the EMILY JEAN entered the channel in question without giving any warning and in violation of her radio agreement to hold her tow up above the bend." [Reference to transcript omitted.]

ed up in the narrowest bottleneck of the two mile stretch, at the terminus of the bend, in or almost in the cross-river sweep of the current, with the Emily Jean and her tow moving down toward her at full speed, attempting to "slide" out of the bend. Then, as Fay Blackman's pilot described it, she "sat" on the point for five to six minutes because "I figured he (the pilot of the Emily Jean) would come out of the slide." The District Court found that large tows ordinarily avoid passing "in the bend above Big Black Light, or in the vicinity of Big Black Light." The Fay Blackman pilot acknowledged that he knew that it was not a good idea for boats to meet in the crossing at Big Black Point, knew the downriver boat had the right of way, and knew the general custom concerning maneuvers of ascending and descending boats at river crossings (see footnote 2, *supra*).[11] In addition, although other testimony puts the Emily Jean's loss of control of her tow as occurring at a later point in time, the testimony of the Fay Blackman pilot was that Emily Jean was out of control during the entire period (five to six minutes) that Fay Blackman "sat" on the point. In these circumstances, under § 346, the risk of collision required Fay Blackman to reverse her engines and withdraw from her exposed position off the point to the shelter of the point where she would be safe from collision. One need not speculate whether this was feasible. Blaisdell, the Fay Blackman pilot, testified:

Q. Now, there was no reason in the world why, after you spotted the Emily Jean that you couldn't have backed far down the River if you would have wanted to, was there?

A. Well, I already told him I was going to hold the point, I figured he would come out of the slide.

Q. Would you answer my question, there was nothing to prevent you from having backed a long way down the River if you had wanted to?

A. I mean, I could have backed way on down there. I had backing rudders.

Q. There was nothing to keep you from putting your barges in behind and under that point, if you had wanted to, was there?

A. No, I could have put them under the point.

Ultimately, immediately after or concurrently with the warning from Emily Jean (the third radio conversation, see footnote 4, *supra*), Fay Blackman did reverse her engines and begin to move astern out of the bottleneck, but her movement came too late. After the collision she pulled in to the sheltered position below the point.

Continuing with the second possibility —that Fay Blackman was within the narrow water off Big Black Point when she first sighted Emily Jean—we consider other possible grounds of liability. The Narrow Channel Rule requires the ascending vessel to "lie as close as possible to the side of the channel," and the District Court found that she was 15 to 30 feet off the point. But vessels do not habitually meet in the narrow stretch of water where the Fay Blackman positioned herself,[12] and for her to maintain that position clearly imported danger. Her obligations therefore extended beyond compliance with the Rule. *See* American S.S. Co. v. Interlake S.S. Co., 208 F.2d 439, 441 (2d Cir. 1953); Construction Aggregates Co. v. Long Island R. Co., 105 F.2d 1009, 1013 (2d Cir. 1939). "Safety is always the overriding consideration," Construction Aggregates Co., *supra*, at 1012. Whether measured by standards of navigational custom or

---

11. Evans, a Corps of Engineers pilot, and others also, testified that the upriver boat normally lies below the point until the downriver boat clears the narrow stretch of river at the point. All witnesses agree that the upriver boat, stemming the current, can maintain better control of its tow, more easily come to a stop, and move in reverse, than can a downbound boat.

12. See note 11 *supra*.

the exercise of due care, the Fay Blackman did not comply with her obligation by positioning herself on the point and remaining there when she could have positioned herself close to the side of the channel below the point.

■■ The agreement of Fay Blackman to a port to port passing does not excuse her actions. Neither vessel could enter an agreement which obviated its obligations under the navigation rules unless there were special circumstances rendering a departure necessary to avoid immediate danger. 33 U.S.C. § 350; Belden v. Chase, 150 U.S. 674, 699, 14 S.Ct. 264, 37 L.Ed. 1218, 1227 (1893). *See also* Lehigh Coal & Navigation Co. v. Compagnie Générale Transatlantique, 12 F.2d 337 (2d Cir. 1926); The Richard J. Barnes, 111 F.2d 294 (2d Cir. 1940).

There is no merit to Emily Jean's contention that her original radio agreement to hold up above the bend had no causal connection with the accident. But for her breach of the agreement, which occurred when she reached the bend, the accident would not have occurred. The consequences of her breach flowed directly, and without being terminated by intervening cause, to the collision itself.

■ As an alternate ground of fault against Emily Jean, the District Court found that in the bend above Big Black Point downbound tows often proceed down the right extremity of the channel adjacent to the island, and, having made an agreement with Fay Blackman for a port to port passing, Emily Jean was at fault for favoring the left descending bank of the bend rather than the right. The evidence supporting this conclusion is very thin, and some of such as there is tends to indicate that it applies to only smaller vessels and tows. Because there are other grounds of fault by Emily Jean, and because this doubtful conclusion of the District Court, if left in effect, may affect navigation practices on this stretch of the river, we conclude that this finding should be vacated.

■ We find no scope of application in this case for major-minor fault. *E. g.,* Jack Neilson, Inc. v. Pure Oil Co., 233 F.2d 790 (5th Cir. 1956); Compania De Maderas De Caibarien, S.A. v. The Queenston Heights, 220 F.2d 120 (5th Cir. 1955).

The decree appealed from will be modified so as to vacate the findings concerning following the righthand bank. It will be modified to hold the Fay Blackman as well as the Emily Jean at fault and to hold that major-minor fault is not applicable. As so modified it is affirmed.