## THE NESSMORE.

### PERRY *et al.* *v.* THE NESSMORE.

*(District Court, D. Maryland. January 20, 1890.)*

1. COLLISION—BETWEEN STEAMER AND SAILING VESSEL—CHANGE OF COURSE.
    A schooner inside Cape Henry light-house, at midnight, was run into and sunk by the steamer N. The schooner's witnesses testified that no change was made in the schooner's course, and that they mistook the steamer for a pilot-boat intending to run across the schooner's stern close enough to speak them. This testimony was corroborated by the fact that the respective courses of the vessels would have brought them together about where the collision actually occurred. *Held,* that the schooner's witnesses would be believed, though the officers of the steamer testified that the schooner had changed her course to port.

**2. SAME—LIGHTS.**

The schooner's witnesses testified that her side lights were properly set, and burning brightly, and that her green light was seen by them and others from the steamer's deck after the collision. The pilot and master of the steamer testified that they were on the lookout for a pilot-boat; that, on discovering her mast-head light, they burned a blue light as a signal; that soon after they saw a torch in that direction, which they took to be an answering signal from the pilot-boat; that they saw a small white light, which was moved up and down once or twice; and that, though they looked carefully, they could see no side lights on the vessel, which afterwards proved to be the schooner. It also appeared that the burning of the blue light on the steamer had a blinding effect, and would make it impossible for those whose eyes were affected by it to see the green light of the schooner for some time afterwards; that the attention of the master and pilot was concentrated on the mast-head light of the pilot-boat, watching for an answering signal; and that after the answering signal the schooner and steamer were so close that all that could be done was to reverse the steamer's engines. The pilot admitted that he saw a small green light just before the collision, in the schooner's rigging. *Held*, that the evidence fairly established that the schooner's green light was burning.

**3. SAME—LOOKOUTS.**

Where it appears that the master of the schooner would not have been justified in changing her course even if he had closely observed the steamer's lights, the fact that the schooner's lookout, after reporting the steamer's lights, was called away to help get up a sail, does not put the schooner in fault.

**4. EVIDENCE—WEIGHT AND SUFFICIENCY.**

Alleged contradictory statements, made by some of the schooner's witnesses after the collision, will not be given much weight to discredit their sworn testimony on the trial, when the proof as to what they said was uncertain.

In Admiralty. Libel for damages.

*Frank Goodwin, Eugene P. Carver*, and *Marshall & Hall*, for libelants.
*Brown & Brune*, for defendant.

MORRIS, J. This libel is filed by the owners of the schooner to recover damages resulting from a collision which happened about midnight on the 25th of August, 1889, in the Chesapeake bay, just inside of Cape Henry light, between the steam-ship Nessmore, a large iron-screw steamship of over 2,200 tons, and the three-masted schooner Joseph Wilde, of about 300 tons. The schooner was cut into on her starboard side, between her main and mizzen rigging, nearly to her keel, and was a total loss, with all the property on board. The schooner was loaded with ice, and was on a voyage from Bangor, Me., to Richmond, Va. She came in port from the sea past Cape Henry between 10 and 11 o'clock that night. The wind was a good stiff sailing breeze, from N. N. E., and her course was W. N. W.; and she had reached a point three or four miles inside Cape Henry light when she was struck. It was the master's watch; and he was on deck, with one seaman at the wheel and one on the lookout. About half-past 11 o'clock the master went below, and called the mate to assist in getting up the spanker, which had been lowered during the afternoon on account of the wind and sea outside. The schooner was making five or six knots an hour through the water. Just as the master came on deck again, the lookout reported a light; and, going forward, the master saw what he took to be the mast-head and green light of a steamer three or four points on his starboard bow. After looking at it, he came back aft, and called to the mate to bring the torch, which the mate did, exhibiting it on the schooner's starboard side, just aft of the fore rigging. After the torch had been exhibited and extinguished, the master took the wheel; and the mate and all the seamen, including the

lookout, went to work to loose the spanker, and get it up. They had got the peak of the sail about half-way up, and were going across to the port side to get at the throat halliards, when they saw that the steamer was close upon them, on their starboard side; and immediately afterwards the vessels struck. All the men on the schooner at once climbed up, some on her main and some on her mizzen rigging, and got onto the steamer's bow, and were saved. The cut made by the stem of the steamer entered aft of the schooner's main rigging, and penetrated obliquely towards her mizzen mast; and the blow was of such force as to cut well into the center of the vessel, and cause her to sink.

The master of the schooner testifies that soon after he took the wheel he looked, and saw both the steamer's lights, and saw that she was coming towards him, but he was not alarmed, as he supposed it was the steam pilot-boat intending to run across his stern close enough to speak him; and, to enable those in charge of her to see just where his stern was, he held up a lantern, which he had by him at the wheel, and waved it.

The testimony of the master and lookout, and of other witnesses from the schooner, is very positive that just before the collision the schooner's side lights were properly set and burning brightly, and also that the schooner's green light was seen by them and others from the steamer's deck after they got aboard of her, and before the schooner disappeared. They testify also, very positively, that no change was made in the schooner's course.

It appears from the testimony of the Chesapeake Bay pilot, in charge of the steamer, and of her master, that she had left Baltimore in the morning on a voyage to Liverpool, and that when about six miles below York Spit light, she was headed for Cape Henry light, on a course about S. S. E. She ran that course, for about an hour, at a speed of about 10 knots, which brought her off the tail of the Horseshoe, to about the place where, usually, pilots slow down the speed of steamers they are taking to sea, and signal for the pilot-boat to take the pilot off. The pilot and master were on the steering bridge, with a quartermaster at the wheel; and there was a lookout on the forward or lookout bridge. These officers were looking for the light of the steam pilot-boat, which they expected to find somewhere near the Cape Henry light, when they made out the lights of a long tow, consisting of two steamers and a vessel of some kind, coming in from the sea, and crossing their course from port to starboard. In order to give this tow plenty of room, the engines were slowed, and the helm starboarded a little, until the tow passed about a mile and a half ahead of them. The steamer was again headed for Cape Henry light, and her engines were continued slow, as they wished to gradually lessen her speed, in order to discharge the pilot. After the tow had passed, they made out a white light three or four points on the steamer's port bow, which they took to be the steam pilot's mast-head light, about four miles off. They then burned a blue light over the steamer's port bow, as a signal to the pilot-boat; and soon after they saw a flare-up light or torch in that direction,

which they took to be the answering signal from the pilot-boat, which they were expecting. The pilot-boat did in fact answer with such a torch; and it seems probable that what they saw was, as they took it to be, the pilot-boat's answering signal. After seeing the torch, and while looking in that direction, the pilot and master presently saw through their glasses a small white light, which was moved up and down once or twice.. This was no doubt the lantern held up by the master of the schooner, and waved by him. Both the pilot and the master of the steamer testify positively that, although they carefully looked, they could see no side lights on the vessel, which afterwards proved to be the schooner; and, as they saw no side lights, they took her to be a sailing vessel with her stern towards them, going in the same direction with them,—showing her binnacle light, or some stern light. The pilot ordered the steamer's wheel aport, and presently, discovering that she was a sailing vessel, coming towards the steamer, and apparently changing her course across the steamer's bow, he ordered the engines full speed astern, to which the master replied that they were going astern. The pilot states that when the schooner was getting across the steamer's bow, and was about 100. yards off, he discovered for the first time, through his glasses, a small green light in the schooner's starboard rigging. The pilot and master of the steamer express themselves with some hesitation as to whether, at the moment of collision, the steamer's headway had been overcome. The master is inclined to think it was, and that she had begun to go astern; but from all the testimony, from the violence of the blow, and from the engineer's log, I conclude that the steamer must have been moving forward at least five miles an hour at the time of the collision. The pilot-boat remained stationary where she was laying when her mast-head light was first seen; and the working of the engines after the collision, as evidenced by the engineer's log, would hardly have brought the steamer to the pilot-boat, if she had lost her headway at the time of the collision.

There is an explanation of the statement made by those on the schooner that they saw the steamer's green light off their starboard bow, which I think is very obvious, and which assists in fixing the sequence of occurrences preceding the collision; and that explanation is that it was the blue signal light which was burned over the steamer's port bow which the lookout and master of the schooner saw, and which they not unnaturally took for her green starboard side light. It would appear from the testimony of the schooner's lookout that after he went on the top-gallant forecastle, at 10 o'clock, he made three reports of lights—*First*, the lights of the tugs and tow; *next*, the steamer's mast-head light; and, *third*, the steamer's green light, which he saw about four points on the starboard bow, and about two and one-half miles off. Soon after he had reported the green light, the torch was burned on the schooner, which probably somewhat blinded both him and the mate, who was holding it; and soon after that he was called aft by the mate to set the spanker, and he gave the lights no further attention. The lookout, the mate, and the master of the schooner, all testify to seeing this

light, which they took to be green. It could not possibly have been the steamer's starboard light; and it must have been the blue signal light, which was burned over her port side, and which, while burning, would obscure her red light to them.

That the schooner made no change in her course is, I think, fairly established. The testimony of her master and crew is positive that she held her course; and I find nothing to cast a doubt upon their testimony on that point. It receives confirmation, also, from the fact that the respective courses of the vessels, without any change of course, would have brought them together just about as they actually struck. That the master and crew of the schooner were not alarmed by the approach of the steamer is shown by their continuing to work at getting up the spanker, and in the master's waving the lantern to indicate his exact position to what he supposed to be the pilot-boat. It would appear, moreover, that if the schooner had changed her course to port, which is supposed by the officers of the steamer to have been the change she made, it would, if done in time to alter her position, have probably avoided the collision, as they frankly admit. That the pilot and master of the steamer honestly think that the schooner did change her course I have no doubt, but it is common experience that a sailing vessel, in the night-time, appears to change her course as her sails come more distinctly into view; and this impression upon the senses, in such cases, is stimulated by the strong bias to believe it is so, affecting the persons who observe it from the other one of two colliding vessels. It cannot be relied upon, therefore, without proof of corroborating facts.

The principal difficulty, as it seems to me, of this case, is whether or not the schooner's green light was burning, so as to be visible to those on board the steamer. The burden of proof is upon the schooner to prove that it could be seen; and I am free to say that if there were no way of accounting for the positive testimony of the pilot and master of the steamer that they could not see the light except by discrediting their veracity, I should find great difficulty in doing so. They are both men of experience and reputation, and they gave their testimony with apparent candor and fairness. They testified quite independently of each other, and with no opportunity of either knowing what testimony the other would give. But there is unusually strong and direct testimony, from those on board the schooner, that the light was burning properly both before the collision and afterwards; and there is the admission of the pilot that he saw it dimly just before the vessels came together. In my judgment, the preponderance of proof fairly establishes that the schooner's green light was in its place, and burning; and there are circumstances developed by the testimony which I think reasonably explain why it was that the pilot and master failed to observe it. Whether the steamer's lookout saw it or not is not positively known, as he had shipped from Baltimore, in order to reach his home in Germany, and, on the steamer's arrival in Liverpool, at once left the ship, and could never afterwards be found. But I take it that his testimony would be the same as that of the pilot and master. In the first place, it is quite

probable that while the long string of lights on the two steamers and their tow was approaching and passing the steamer the schooner's light, being beyond them, could hardly be made out from the steamer. Immediately after the tow passed, the blue light was burned over the steamer's port bow, just in the line in which the schooner's green light would have appeared from either the steering or the lookout bridge of the steamer. The effect of that light was blinding for the time, and made it impossible for those whose eyes were affected by it to see a green light in that direction, either while it was burning or for a short time afterwards. It was probably during the burning of the blue light that the schooner showed her torch, and that torch was not seen from the steamer for the same reason. The pilot and master of the steamer having before that seen the pilot-boat's mast-head light,—which, no doubt, was a very good one,—after the blue light was burned, concentrated their attention on that light, to see if the pilot-boat gave them an answering signal. They watched that light, and presently saw the answering torch exhibited on the pilot-boat. The steering bridge of the steamer is 136 feet from the bow, and is not a favorable place for seeing a light which is as close as the schooner's light then was. During all this time the steamer and schooner were approaching; and it was not until they were close to each other, and the master of the schooner held up his lantern, that she attracted their attention at all. Then the schooner was so close that all that could be done was to reverse the engines of the steamer; and the attention of those on the steamer was engrossed in the movements of their own ship, and in trying to make out the exact nature and course of the approaching vessel, and not to observing her lights. I cannot take their failure to see the green light during this short interval of time, with their attention thus distracted, as sufficient to overcome the affirmative proof that it was properly burning. There is another explanation which suggests itself as accounting for the collision, which is that the pilot and master of the steamer did not see the answering torch of the pilot-boat, which was much further off, but did see the torch exhibited by the schooner, which could have appeared nearly in the same direction. If this be the fact, it would explain a remark which the mate of the schooner says the master of the steamer made to him after the collision on the bridge of the steamer. The mate testifies that he asked the master of the steamer if he did not see the schooner's torch, and the master replied: "Yes, I saw the torch, and if you had not shown it I would not have run into you." If this explanation is the true one, the officers of the steamer mistook the schooner for the pilot-boat, because her torch was the answering signal they were looking for; and they then shaped their course, not to avoid her, but to run close to her. The steamer would then very soon show both her side lights to the schooner; and the schooner's mate testifies that after extinguishing the torch and putting it away he came up again on deck, and before he went to work getting up the spanker he saw both the steamer's green and red lights. This explanation is consistent, also, with certain averments in the answer filed by the master of the steamer, in which he states that

"at 11:30 the engines were slowed, and blue lights were burned as signals to the pilot-boat to come and take off the pilot. That at 11:35 the engines were put full speed ahead, but at 11:36 they were again slowed, and were so continued until 11:42, when they were stopped; and the Nessmore was then awaiting the coming of the steam pilot-boat, which had replied to the signals of the Nessmore, and was some distance off to port. At 11:45 the engines were reversed full speed astern. At 11:52 the engines were stopped, the collision having occurred, to prevent the vessels from falling apart." If the schooner was thus mistaken for the pilot-boat, it would appear probable that from 11:35, when the engines were put full speed ahead for one minute to get the steamer headed on her course, she was designedly steered for the schooner until 11:42, when the engines were stopped because they had discovered their mistake. If this was so, it would explain the remark about the torch-light having caused the collision, which the mate says he never could understand, and about which the master of the steamer was not questioned on the witness stand. It would also explain why, supposing whatever lights they saw on the pilot-boat were the lights of the vessel which exhibited the torch, the pilot-boat and the schooner being about in the same line of vision from the steamer, they did not concern themselves about the lights until they found they were so rapidly coming upon the schooner, and began to see her sails. It is quite possible, therefore, that there was a double mistake; those on the steamer mistaking the schooner for the pilot-boat, because she appeared to answer the blue light with a torch, and the master of the schooner mistaking the steamer for the steam pilot, because she continued to approach him after he had warned her of his position by exhibiting the torch. One or the other of these explanations must, I think, be the true one, and either of them sufficiently shows how it was that the attention of those in charge of the steamer was accidentally diverted from the schooner's light, and how it happened that they pursued a course which took the steamer towards her until too late to escape the collision.

It has been strongly urged by counsel for the steamer that upon the schooner's own showing she is in fault, because, after reporting the steamer's lights, the lookout was called aft from the top-gallant forecastle, his proper station, and all hands except the master, who took the wheel, went to getting up the spanker, giving no attention to the approaching lights of the steamer. The case of *The Sunnyside*, 91 U. S. 222, is cited as supporting this contention. That case is authority for the rule that, even though the sailing vessel holds her course when approaching a steamer, yet, if she fails to adopt all reasonable precautions to prevent collision which ordinary seamanship would dictate, she will be held in fault. No doubt that rule would be applicable if there were special circumstances in this case which the master of the schooner might have learned from closely watching the lights of the steamer, and which would have plainly shown him that safety required him to depart from the statutory rule; but, as reiterated in *The Sunnyside*, "it must be a strong case which puts the sailing vessel in the wrong for obeying the

rule." In *The Sunnyside* the steam-tug was lying nearly stationary, almost dead ahead of the sailing vessel, in a place where it was well known that steam-tugs were accustomed to wait for tows. The morning had so far dawned that such a vessel could be seen without lights a mile and a half or two miles off. The court found that the officers of the sailing vessel had abundant time and means after the steam-tug was reported to have determined that she was not in motion, and that they could easily have gone either ahead of the tug or under her stern, instead of continuing to head directly for her, running her down, as she lay nearly stationary, directly across the sailing vessel's course. The special circumstances found by the court were that the steam-tug was obviously not in motion, and was at a place where she might be expected to be found not in motion; and the reason why the sailing vessel should have departed from statutory rule was held to be that the rule requiring steamers to keep out of the way is applicable to steamers in motion. I cannot, however, perceive how such a contention can be supported on the facts of this case. There was nothing by which the schooner could disinguish this steam-ship's movements from that of any other steamship navigating those waters. The steamer, although she had slowed her speed, was pursuing her voyage to the capes, and it was her duty to avoid the schooner. Her officers endeavored to perform that duty when they became aware it was a schooner. They were entitled to choose their own method of doing so. How long the steamer had seen his light, and what maneuver she would adopt, the master of the schooner could not know from watching her lights. If he attempted any maneuver of his own, it might be the very one which would thwart the steamer, and put the schooner in fault. Without knowing, or any means of knowing, what the steamer was proposing to do, no skill or observation on his part could suggest to him, so far as I can see, anything that he ought to do, except to obey the rule, and keep his course.

As shaking the credit to be given to the schooner's witnesses, it is urged that the court should give weight to the testimony as to alleged contradictory statements and admissions made by some of them on board the pilot-boat after the collision; but experience in this class of cases does not justify dependence upon such testimony. The persons who report such conversations are full of previous impressions, and of strong bias, which colors what they hear; and the great liability to misunderstand what is said is very obvious. I do not find, in this case, that the proof of what is claimed to have been said, and the meaning intended to be conveyed, is of such a clear and unmistakable character as to discredit the sworn evidence of the witnesses sought to be impeached. In my judgment, the libelant's case is made out, and the steamer is to be held solely responsible for the damages resulting from the collision.