### THE AMERICAN EAGLE.
### THE AUSTRALIAN.
### THE MELBOURNE.
### THE PRESIDENT HAYES.

District Court, S. D. New York.
March 23, 1933.

Burlingham, Veeder, Feary, Clark & Hupper, of New York City (C. I. Clark, of New York City, of counsel), for libelant.

Kirlin, Campbell, Hickox, Keating & Mc-Grann, of New York City (Robert Erskine, of New York City, of counsel), for respondent.

FRANK J. COLEMAN, District Judge.

The collision in suit between the steamer President Hayes and the tow of the tug American Eagle occurred in the Hudson river off pier 32, Manhattan, on August 16, 1928, at about 4 p. m. The steamer had backed from her slip in Hoboken and was straightening out to proceed to sea when the tug coming downstream with a hawser tow of three barges in tandem attempted to pass under her stern, and the first barge collided with the steamer's stern causing damage to both the first and second barges and a partial loss of cargo.

Libelant's contention is that the steamer backed too far across the river unnecessarily interfering with the tug's course; that the steamer had actual sternway at the time which caused the collision; and that the tug was prevented from giving leeway by the presence of other craft on the New York side.

The American Eagle on her course downstream near the middle of the river was almost a mile and a half above the steamer when she sighted the latter leaving her slip, and the tug captain knew that in ordinary course the steamer would occupy the western half of the river in her turning operation. He knew it would be necessary for him to pull toward the New York shore in order to pass, and he did so to some extent, but where and how far does not satisfactorily appear. At any rate, he did not pull over far enough for his tow to clear the steamer, and the first question to be determined is whether the collision occurred on the eastern or on the western side of the river.

On account of the strong ebb tide flowing at the rate of between two and three knots, the steamer, which was 522 feet long, was assisted by four tugs, two on her port quarter, shoving upstream, one or her starboard bow, shoving downstream, and one with a hawser from her stem, pulling downstream. This, I find, was adequate provision to make possible the straightening out of the vessel on the Jersey side of the river without crossing midstream. The steamer's engine movements, however, were not satisfactorily proved because the unexplained alterations in the logs entirely justify the suspicions expressed by libelant's counsel. A computation of distances from the entries which do appear would be too speculative to be enlightening.

Our main reliance, therefore, in determining the location of the collision, must be the estimates of distances by eyewitnesses. The river at that point is 3,200 feet wide and the libelant's witnesses place the accident at about one-third the distance from the New York shore, while the claimant's put it at about the same distance from the Jersey shore. The hopeless conflict not only between the two groups of witnesses, but also between the various witnesses on the same side and even between different statements of the same witnesses, makes an exact locating impossible. I believe that the collision occurred at about the middle of the river and that the libelant, who has the burden of proof, did not adduce a greater weight of evidence to the contrary. There were no circumstances proved tending to show a variation from the normal and ordinary course on

718

the part of the steamer except the unexplained alterations in the logs and the statements of the two witnesses on a Jersey pierhead four piers below the steamer's berth, who testified to unusual speed on leaving the slip. The latter testimony I found not very convincing as to the speed and rather remote from the point of the collision. In the captain's report to the local inspectors no mention was made of the steamer's alleged backing to the eastern side of the river. Under all the circumstances I feel that it would be pure speculation for me to locate the collision otherwise than at about the middle of the stream.

■ As to whether the President Hayes still had sternway at the time of the collision and thus physically contributed to the accident, I believe there is not a preponderance of evidence in favor of such a finding, but that the greater weight is to the contrary. Upon this point there is the same hopeless conflict in the testimony of eyewitnesses. The fact was proved by libelant's own witness that at the time of the collision the steamer had turned sufficiently down stream to make her starboard side visible from the Jersey shore at a point south of the slip which she had left. Her engines, of course, had been going ahead for some time prior to the collision since the captain of the American Eagle saw the quick water when he was still 600 feet above her. It seems probable to me that she would have lost her sternway by the time that the straightening out maneuver had progressed to the point that she was tending to head down stream.

■ The American Eagle was clearly negligent. She proceeded for a distance of almost a mile and a half to a point where she had reason to believe there would be danger without taking adequate steps to avoid it. While it is true she was burdened with a heavily loaded hawser tow and a strong tide underfoot, there was no necessity for her attempting to shave the stern of the steamer so close. The presence of the overtaking car float on her port side undoubtedly interfered somewhat with the American Eagle's pulling over further toward the New York shore, but she could have reduced her speed and dropped in behind the car float or could have approached closer to its course and thus have avoided the collision.

During most of the mile and a half she was under full speed making four or five knots with the tide. She reduced to half speed when about a quarter of a mile from the steamer and some time thereafter put her helm hard astarboard so as to approach closer to the New York shore. Whether this operation tended to throw the barges toward the Jersey shore and thus into the stern of the steamer need not be considered. The steamer was at about the place where the American Eagle should have expected it and it was negligence to have approached so close with an unwieldy tow.

If the above findings as to the location of the collision and the sternway of the steamer are correct, there was clearly no negligence on its part. She was lying practically motionless with her engines full speed ahead for a substantial period of time before the collision. There was nothing she could have done to avoid it after its likelihood became apparent. In fact the tug captain himself did not anticipate the accident until the moment of the blow.