Kirlin, Campbell, Hickox & Keating, New York City, for Libellant-Appellant United States Lines Company; John F. Gerity, New York City, Advocate.

H. G. Morison, Assistant Attorney General; Irving H. Saypol, United States Attorney, New York City, and Alfred T. Cluff, Special Assistant to the Attorney General, for Cross-libellant British Ministry of War Transport.

Before AUGUSTUS N. HAND, CHASE and FRANK, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

The libel and cross-libel sought respectively to recover damages arising through a collision between the S. S. Ocean Vagrant, owned by the British Ministry of War Transport, and the S. S. Chagres, owned by the United States Lines Company. The trial court ordered the libel and cross-libel consolidated for the purpose of the decree and in its decree adjudged that the Chagres and the Ocean Vagrant were each at fault for the collision and accordingly divided the damages. Each party appealed. We hold that the libellant United States Lines Company, owner of the Chagres, is entitled to full damages for any injuries suffered by that vessel as a result of the collision, and that the British Ministry of War Transport, owner of the

## UNITED STATES LINES CO. v. THE OCEAN VAGRANT.

## BRITISH MINISTRY OF WAR TRANSPORT v. THE CHAGRES.

No. 128, October Term, 1949.

No. 21517.

United States Court of Appeals Second Circuit.

Argued Jan. 7, 1950.

Decided Jan. 26, 1950.

Ocean Vagrant, should recover no damages because the collision was solely due to the fault of the Ocean Vagrant.

The Chagres and Ocean Vagrant were single screw steamers each about 425 feet long. At the time of the collision, which was at about 7:15 A.M. on May 7, 1943, visibility was good and there was no wind of any importance. An ebb tide of about one and one-half to two knots was running in the North River. The Chagres had been moored at Pier 62 on the Manhattan side of the stream. Just before the collision she came out of the slip between Piers 62 and 61, stern first, in the direction of the New Jersey side of the river, preparatory to heading downstream in order to load at Caven Point, New Jersey. The Ocean Vagrant was coming down the river parallel to and 300 to 400 yards off the ends of the Manhattan piers when she saw the Chagres emerging from her slip stern first. At that time the Ocean Vagrant was from one-half to three-quarters of a mile above Pier 62. On sighting the Chagres, the Ocean Vagrant sounded a one blast whistle, indicating that she proposed to go to starboard but did not alter her course or speed (although, as the trial judge found, if she had done so, no collision would have occurred) but continued ahead on the Manhattan side of the river instead of hauling over to the Jersey side, and did not promptly order any movement of the helm to starboard.

The court found that when the Ocean Vagrant received no answering signal from the Chagres, she blew another one blast signal and ordered a starboard wheel. It also found that the angle of the collision was almost a right angle, an indication that the Ocean Vagrant did not take any avoiding action until she was in the very jaws of the collision, which was found to have occurred about 900 to 1000 feet from the river end of Pier 61, Manhattan, or some 400 or 500 feet from the middle of the river.

The court further found that there was no traffic between the Ocean Vagrant and the New Jersey shore, that there was no excuse for the Ocean Vagrant continuing ahead instead of hauling over to the Jersey side, and that the Ocean Vagrant was "glaringly negligent and at fault in causing the collision."

We agree with the trial judge that there was no excuse for the navigation of the Ocean Vagrant and that the negligent navigation of the latter was the cause of the collision and the damage to the Chagres.

It is argued on behalf of the Ocean Vagrant that the Chagres had no reason to go so far out into the stream before making her turn to go down the river. But at the end of Pier 61 there were 8 to 10 barges moored, occupying about 300 feet of the river beyond the end of the pier. In such circumstances it cannot be said that the Chagres backed out too far when preparing to make her turn. As we held in Fort St. George (The Olympic), 2 Cir., 27 F.2d 788, 790: "The backing vessel is less readily maneuvered, besides having much less way, which makes it easier to avoid her. She has the harder position, if one is demanding quick changes in heading or position." We think that in this case the Chagres was not backing so far as to interfere with the proper navigation of vessels on their courses and was not proposing to occupy too large a part of the river in carrying out her maneuver. The trial judge found that the Chagres, in undocking, might reasonably back to the middle of the river, a distance of some 400 or 500 feet beyond where she went. It is not necessary to say that this would have been reasonable under all circumstances, but it does seem clear that in view of the absence of any traffic on the New Jersey side and the notice afforded by the one blast signal of the Ocean Vagrant, the Chagres could not be said to have backed too far.

The court below divided the damages on the ground that the Chagres was at fault (a) in not having a proper lookout, and (b) in not answering the one blast whistle of the Ocean Vagrant. We cannot see that the absence of a designated lookout could have contributed to the collision. The position of the Chagres in the river was known to the Ocean Vagrant when the latter was between one-half and three-quarters of a mile up the stream. The single whistle then blown informed the Chagres that the

Ocean Vagrant was going to starboard, and if that signal had been followed up promptly, the court found that no collision would have occurred. It seems unreasonable to suppose that the Chagres would have kept farther in to shore because of any observation by members of her crew of the navigation of the Ocean Vagrant. There was plenty of chance to avoid the Chagres if the signal had been promptly followed up by the Ocean Vagrant and the Chagres had every reason to suppose that it would be so followed up. It would be unreasonable to require the Chagres, engaged as she was in an awkward maneuver and not yet on her course, to keep further inshore than she did when she had been plainly notified that the Ocean Vagrant was going to starboard.

The contention that the Chagres was at fault in not answering the one blast whistle of the Ocean Vagrant is without substance. The Chagres was not on her course, and under the Rule of Special Circumstances which applied there was no requirement of an answer to the signal of the Ocean Vagrant. See Merritt, Chapman & Scott Corp. v. Texas Co., 2 Cir., 98 F.2d 719, 720. It is argued on behalf of the Ocean Vagrant that an answer by the Chagres to the signal of the former was required under our decision in The Transfer No. 18, 2 Cir., 74 F.2d 256. The situation there was quite different. There was a far narrower channel, and an undocking tug was found to have gone so far out into the stream with her carfloat as to impede the navigation of another tug with carfloats. No passing signals were blown by either party. The undocking tug with its float was occupying too much of the fairway and was held, in view of the likelihood that the other tug and floats would swing down on her to have been under an obligation to give a signal showing on which side the other tug should pass. It is evident that the case was not one of answering signals, nor did it lay down a requirement that there should be signals in a case like the one here where the navigation proposed, had it been promptly carried out by the Ocean Vagrant, would have been safe to all parties. We see no reason

for dividing the damages in a case like this.

The interlocutory decree is modified so as to exonerate the Chagres and hold the Ocean Vagrant solely at fault. Costs are awarded to the United States Lines Company, demised owner of the Chagres.