The **STUYVESANT INSURANCE COMPANY, Libelant,**

v.

The **STEAMSHIP ESSO TAMPA, her engines, boilers, tackle, furniture, apparel, etc., in rem, and Humble Oil and Refining Company, in personam, Respondents.**

**No. 6364.**

United States District Court
E. D. Louisiana,
New Orleans Division.
July 2, 1968.

Patrick L. Burke, Faris, Ellis, Cutrone, Gilmore & Lautenschlaeger, New Orleans, La., for libelant.

Alfred M. Farrell, Jr., Terriberry, Rault, Carroll, Yancey & Farrell, New Orleans, La., for respondents.

EDWARD J. BOYLE, Sr., District Judge:

On January 22, 1964 this libel was filed in admiralty by the Stuyvesant Insurance Company, hull underwriters of the Fishing Vessel CAPTAIN JOHN SANTOS, against the Steamship ESSO TAMPA and her owner, Humble Oil & Refining Company, for damages sustained by the F/V CAPTAIN JOHN SANTOS as a result of a collision between the F/V CAPTAIN JOHN SANTOS and the S/S ESSO TAMPA on August 9, 1963 in the Mississippi River. The Stuyvesant Insurance Company paid to Santos Menhaden Corporation, the owner of the F/V CAPTAIN JOHN SANTOS, the sum of $32,369.20 representing the total value of the vessel, and, by virtue of said payment, became the subrogee and/or assignee of any rights accruing to the Santos Menhaden Corporation as a consequence of this collision.

The issue of liability was tried to the Court on a former day and taken under submission.

The testimony of the witnesses regarding the sequence of events culminating in the collision is generally conflicting. However, some of the facts setting the stage for this incident are not the subject of serious dispute.

Late in the afternoon of August 9, 1963 the F/V CAPTAIN JOHN SANTOS entered the Mississippi River in the vicinity of Empire, Louisiana, and was headed upstream for Harvey, Louisiana whereat she was to enter a shipyard to have certain repairs made to her hull and underwater fittings, necessitated by a prior grounding sustained while the vessel was in fishing service.

That same afternoon at approximately the same time, the S/S ESSO TAMPA, a "baby-super" tanker, was also proceeding upstream in the Mississippi River headed for Baton Rouge, Louisiana, and upon reaching Pilot Town, located below Empire, took on a river pilot.

These vessels proceeded on their respective journeys, apparently without incident and each unaware of the existence of the other, until the faster S/S ESSO TAMPA drew within sight of the F/V CAPTAIN JOHN SANTOS some two miles ahead as the S/S ESSO TAMPA came abeam of Port Sulphur, Louisiana at approximately 7:30 P.M. At this time, the ESSO TAMPA was navigating slightly to the east (right) of mid-river at a speed of 13–14 miles per hour while the JOHN SANTOS was navigating slightly to the west (left) of mid-river at a speed of approximately 10 miles per

hour. Each vessel maintained its course and speed until the vessels were approximately ½ mile apart. The weather was fair and nighttime visibility was otherwise unrestricted.

Meanwhile, on the JOHN SANTOS, unknown to those in command of the ESSO TAMPA, the pneumatic system energizing the shifting mechanism and whistle became inoperative.

What happened from this point in the sequence of events until the bow of the JOHN SANTOS came into collision with the starboard side amidship of the ESSO TAMPA is obscured by enigmatic conflicts in the testimony of the witnesses and by the inaccuracies apparent in the log of the TAMPA as well as in her deck and engine room bell books.

As a prerequisite to rendering findings of fact, it was incumbent upon the Court to examine meticulously the testimony of each fact witness as well as all the exhibits introduced at trial. The libelant relies upon the testimony of Captain Salter and Verdun Smith. The respondent relies on the testimony of Captain Smith, Pilot Short, and Officer of the Watch Spacek. A summary of the testimony of each of these witnesses may be found in an appendix to these findings of fact and conclusions of law.

After careful consideration of all of the evidence and the briefs of counsel, judgment was rendered in favor of the respondents, the Steamship ESSO TAMPA and Humble Oil and Refining Company, and against the libelant, the Stuyvesant Insurance Company. In connection therewith the Court makes the following:

## FINDINGS OF FACT

### 1.

The Steamship ESSO TAMPA (hereafter TAMPA) was an oceangoing tankship, 628 feet in length, 82.5 feet in beam, and 42.5 feet in depth, propelled by a steam turbine of 12,500 horsepower connected to a single screw. On August 9, 1963 the TAMPA was owned and operated by respondent, Humble Oil and Refining Company, and was proceeding upstream in the Mississippi River in ballast, drawing 25 feet, 6 inches astern.

### 2.

On the same date, the M/V CAPT. JOHN SANTOS (hereafter SANTOS) was a Menhaden fishing vessel of wooden construction, 81.5 feet in length, 20.7 feet in beam, 9.5 feet in depth, propelled by twin engines of a total of 500 horsepower connected to twin screws. The SANTOS was owned and operated by the Santos Menhaden Corporation, and was likewise proceeding upstream in the Mississippi River.

### 3.

The master of the TAMPA was Captain Fred G. Smith. The TAMPA had taken on a river pilot, Captain Alvin Short, at Pilot Town that afternoon. Under the con of Pilot Short the TAMPA was making between 12 and 13 knots, stemming a downstream current of approximately one knot. At this speed it would take the TAMPA in excess of five minutes to come to a controlled full stop.

### 4.

The SANTOS was en route to Harvey, Louisiana whereat she was to enter a shipyard to have certain repairs made to her hull and underwater fittings, necessitated by a prior grounding which occurred while the vessel was in fishing service. The damage inflicted by the grounding incident caused the SANTOS to vibrate to some degree as she plowed upstream at approximately 9 knots. Aboard the SANTOS were her captain, James Salter; the ringsetter, Verdun Smith; the engineer, Price; another unidentified crewman; and Captain Salter's wife and child.

### 5.

The TAMPA and the SANTOS were proceeding on their respective journeys, with the SANTOS a considerable distance ahead of the TAMPA. As late afternoon waned into early evening, the

faster TAMPA drew within sight of the SANTOS, the TAMPA then being about two miles behind the SANTOS and coming abeam of Port Sulphur, Louisiana. At this time, approximately 7:30 P.M., the TAMPA was navigating slightly to the east (right) of mid-river and the SANTOS was navigating slightly to the west (left) of mid-river. Each vessel continued on its course and speed, as previously described, until the vessels were only one-half mile apart.

### 6.

It was then approximately 7:55 P.M., the weather was fair and nighttime visibility was otherwise unrestricted. There is no evidence that either vessel was improperly lighted. The 8:00 P.M. to 12:00 P.M. watch aboard the TAMPA had just assumed stations, as it was the custom aboard the TAMPA for the fresh watch to take over a few minutes early. Mate Spacek was now officer of the watch; Pilot Short was still at the con; and Zekos was forward lookout.

### 7.

Meanwhile, aboard the SANTOS, unknown to those aboard the TAMPA, a sediment bowl, which was an integral part of the pneumatic system activating the gear shifting mechanism and the air whistle, burst. Due to the conflicting and ambiguous testimony of Captain Salter and Verdun Smith, the sequence of events occurring aboard the SANTOS cannot be reconstructed, let alone correlated with corresponding maneuvers aboard the TAMPA. It must suffice to say that the bowl burst, possibly due to the aforementioned vibration, and that the ultimate effect of the rupture was to render the shifting mechanism and the air horn inoperative. Viewing all the evidence together, it is impossible to ascertain when steerage was actually lost and how the SANTOS came to make some of the maneuvers which a preponderance of the evidence reveals she made.

### 8.

When the TAMPA had drawn to within one-half mile of the stern of the SAN-TOS, the latter vessel suddenly veered to her starboard, showing the TAMPA her green sidelight, on a course, which, if maintained, would have taken her across the bow of the oncoming TAMPA and, finally, to the east bank. Immediately the TAMPA was slowed, steered to her port, and sounded a two-blast signal. It is obvious that these maneuvers on the part of the TAMPA were calculated to permit the SANTOS to pass ahead and across the bow of the TAMPA, with the TAMPA passing astern of the SANTOS. The SANTOS did not return the sound signals of the TAMPA, but did show her spotlight toward the east bank, the direction in which she was now proceeding. The TAMPA was ordered stopped, followed by a full astern order for the purpose of checking the westward swing. Although the width of the river would have permitted the TAMPA to veer farther westward, a downbound tug, the SAUSSY H, with a heavy tow was approaching along the west bank, requiring the westward swing of the TAMPA to be halted to avoid the risk of colliding with the SAUSSY H and her tow.

### 9.

The westward swing having been checked, the TAMPA continued full astern for approximately one-half minute, but due to the direction of rotation of the propeller, the stern was being drawn to the left and the bow was swinging toward the SANTOS. Consequently, the TAMPA was briefly put full ahead to alleviate that condition and then returned to full astern.

### 10.

In the interim, the SANTOS had cleared the bow of the TAMPA, and, had she maintained her course, the vessels would not have collided. However, just as the TAMPA was straightening out, the SANTOS drifted or was steered back toward the west bank and headed for the starboard side of the TAMPA which was still at full astern, but making headway over the bottom. The TAMPA sounded a second two-blast signal, which,

like the first, went unanswered. However, the searchlight of the SANTOS was flashed erratically as the SANTOS continued westward. At approximately 7:58 P.M., the bow section of the SANTOS collided with starboard amidship of the TAMPA and passed under the TAMPA's stern. The TAMPA engines had been ordered stopped seconds before in order to eliminate any risk of further injury to the SANTOS as she passed the stern. No danger signals were sounded by either vessel.

## 11.

Following the collision, the SANTOS went to the west bank as the TAMPA stood by. The SAUSSY H and her tow passed astern of the TAMPA along the west bank. As the TAMPA stood by, the SAUSSY H, which had established contact with the SANTOS, reported to the TAMPA that no one aboard the SANTOS was injured. Shortly thereafter the M/V NOVELTY arrived at the scene and her crew advised those aboard the TAMPA that the SANTOS was safe. Thereupon, the TAMPA resumed her journey.

Later that evening a new sediment bowl was brought aboard the SANTOS. After its installation, the SANTOS proceeded upriver.

## 12.

There were three types of logs kept aboard the TAMPA, namely, the deck log, the bridge bell book and engine room bell book. In the bridge bell book each engine order is chronologically recorded as it is given. The engine room bell book is kept in the engine room and in it each engine order is chronologically recorded as it is executed. The log book is compiled by the officer of the watch, usually near the end of each watch, often using the bridge bell book as a guide in its preparation. The inconsistencies in the entries in these three logs for the short period during which this collision devel-

oped certainly do not speak well for the efficiency of the crew of the TAMPA. But, on the other hand, these inconsistencies are too minor to condemn her in view of the circumstances that the watch had just changed or was in the process of changing, and that numerous engine orders were being given within the span of approximately five minutes. The significance of these discrepancies is further diminished by the generally consistent testimony of those in control of the TAMPA relative to the sequence of events culminating in the collision.

## 13.

After post-collision surveys of the SANTOS were concluded, she was declared a constructive total loss and her owner, Santos Menhaden Corporation, received the sum of $32,369.20 from the vessel's hull insurer, The Stuyvesant Insurance Company. Consequently, that subrogated insurer rather than the stricken vessel's owner at the time of the collision, is the libelant herein. The parties having stipulated that this libel be tried upon the issue of liability alone, the Court renders no findings of fact concerning the extent to which the pre-collision damage, as distinguished from the damage that may have been caused by this collision, contributed to the declaration of the SANTOS as a constructive loss.

## CONCLUSIONS OF LAW

### 1.

The Court has jurisdiction of the action and venue is properly laid in the Eastern District of Louisiana.[1]

### 2.

■ The burden of proof rests upon libelant to establish fault on the part of respondents consisting of either a violation of the statutory rules of the road or negligence in the navigation of the respondent vessel or both.[2]

---

1. 28 U.S.C. § 1333.

2. Griffin on Collision, 1949 Edition, Section 24, pp. 38 et seq.

## 3.

 If the libelant succeeds in proving that the respondents were guilty of statutory fault, then the respondents must, in order to escape liability, prove not only that such fault probably did not contribute to the collision, but also that it could not have contributed to it.[3] However, a vessel shown guilty of statutory fault need not, in order to escape liability, prove that its fault could not by any stretch of the imagination have had any causal relation to the collision, no matter how speculative, improbable or remote.[4]

## 4.

Libelant urges that the approach of the TAMPA from downriver constituted an overtaking situation within the purview of 33 U.S.C. §§ 203 and 209 and that the TAMPA violated these statutes when, without assent from the SANTOS, she continued ahead in dereliction of her duty of keeping clear.

However, respondents contend that the situation confronting the navigators of the TAMPA as she approached the SANTOS was one of special circumstances under 33 U.S.C. § 212 and consequently the statutory responsibilities devolving upon an overtaking vessel were inapplicable to the TAMPA.

 It is no doubt true that had the two vessels indefinitely maintained the courses and speeds they were traveling as of the time they were one-half mile apart, the TAMPA would have uneventfully overtaken the SANTOS. But this does not mean that the TAMPA was, as a matter of law, an overtaking vessel. Indeed, when a given rule becomes applicable is infrequently mechanically ascertainable. Rather, the determination of when a given rule comes into effect depends upon varying circumstances often peculiar to each case. In the final analysis the criterion is that an overtaking situation is fixed when it appears or should appear to a reasonably prudent navigator under the same or similar circumstances that the "need for precaution" has begun.[5]

## 5.

 The "need for precaution" arose when the SANTOS suddenly veered to her starboard onto a course which, if maintained, would take her across the bow of the TAMPA. Until that event occurred, no "situation" in the sense of the Inland Rules existed between these vessels; when that event occurred, the situation was *ab initio* one of special circumstances under Article 27 of the Inland Rules (33 U.S.C. § 212). The action of the SANTOS, however caused, in veering eastward into the path of TAMPA constituted such a "danger of navigation and collision" as to preclude application of the Inland Rules governing either overtaking or crossing situations and to require instead the navigators of each vessel to do whatever was possible to avoid collision.

## 6.

 An additional reason why at the time the SANTOS veered to her starboard a special circumstance rather than an overtaking or crossing situation was created is that the SANTOS could not then be said to be on a definite course, but, instead, was undergoing an uncertain maneuver.[6] Indeed, the combina-

---

3. THE PENNSYLVANIA, 19 Wall. 125, 86 U.S. 125, 22 L.Ed. 148 (1874).

4. Compania De Maderas De Caibarien, S.A. v. THE QUEENSTAN HEIGHTS, 220 F.2d 120 (5th Cir., 1955), cert. denied, Esso Shipping Co. v. Compania De Maderas De Caibarien, S.A., 350 U.S. 824, 76 S.Ct. 52, 100 L.Ed. 736 (1955); Pacific Tow Boat Co. v. States Marine Corp. of Del., 276 F.2d 745 (9th Cir., 1960).

5. Griffin on Collision, 1949 Edition, Sections 16 and 55.

6. Lykes Bros. Steamship Co. v. Union Carbide & Carbon Corp., 253 F.2d 444 (5th Cir., 1958) and the authorities cited therein; Hutton Company v. Arrow

tion of the sudden change of course by the SANTOS, the proximity of the vessels, the speed and size of the TAMPA, the time required to bring the TAMPA to a dead stop, the absence of daylight visibility, the unanswered signal from the TAMPA, the almost contemporaneous flashing of the SANTOS' searchlight and, finally, the approach of the downbound SAUSSY H and tow served to take the situation thus presented out of the ambit of the overtaking and crossing rules.

### 7.

■ The evidence indicates that the TAMPA was navigated with due regard to all the circumstances which confronted her. As the situation unfolded it was reasonable for the navigators of the TAMPA to conclude that the SANTOS was making for the right (east) bank and there was nothing imprudent in their attempt to bring the TAMPA toward the west bank around the stern of the SANTOS. That the actions of the navigators of the TAMPA were prudent is borne out by the fact that their attempts to avoid collision would have succeeded had not the SANTOS made another abrupt change in direction and headed directly for the TAMPA.

### 8.

■ Libelant urges that respondents are liable for the consequences of this collision by reason of statutory fault on the part of the navigators of the TAMPA in failing to sound the four-blast danger signal as required by Article 18, Rule III of the Inland Rules (33 U.S.C. § 203). This contention cannot be sustained for the reason that, even if the rules required those in control of the TAMPA to sound a danger signal, the evidence is

overwhelming that to have done so would have served no useful purpose. The failure to sound such a signal could not have been a contributing cause of the collision and hence the respondents are not rendered liable on that account.[7]

Actually, there is every indication that the pair of two-blast signals given by the TAMPA were the most appropriate under all the circumstances in this case. A two-blast signal, coupled by a turn to port by the TAMPA, would normally be interpreted by knowledgeable seamen aboard a vessel in the position of the SANTOS after she, herself, had veered to starboard, that the TAMPA intended to pass the SANTOS on her (the SANTOS') port side. The meaning of the same signal under the International Rules (not applicable here) is that the TAMPA was directing her course to port. Under either set of rules it should have been clear to those aboard the SANTOS that the TAMPA was altering her course to port and that if the SANTOS continued toward the east bank the vessels would avoid collision. To have sounded a danger signal would have only left those aboard the SANTOS bewildered as to exactly what evasive action the TAMPA would take.

### 9.

■ It is unfortunate that the SANTOS, whether under command or out of control, could not or did not continue toward the east bank, having once headed in that direction. There is no evidence in the record to indicate that those aboard the TAMPA should have anticipated that the SANTOS, after apparently steering clear, would fall or steer back to port. Those in control of the TAMPA exercised the requisite prudence in attempting to avoid the ensuing colli-

Builders Supply Corp., 371 F.2d 944 (2nd Cir., 1967). See also Griffin on Collision, 1949 Edition, Sections 42 and 43.

**7.** See Conclusion of Law No. 3, supra. See also Griffin on Collision, 1949 Edition, Section 80, pp. 222 et seq. It is in-

teresting to note that if libelant's contention that the SANTOS was at all material times out of command be accepted, then its contention that the failure of the TAMPA to sound a danger signal was a contributing statutory fault must fall.

sion. Libelant has failed to sustain its burden of proving that the operators of the TAMPA were guilty of negligence contributing to this collision.

### 10.

Libelant having failed to establish any fault on the part of the operators of the TAMPA, statutory or otherwise, which in any manner contributed to the occurrence of this collision, respondents should have judgment dismissing this libel at libelant's cost.

### 11.

In view of the foregoing findings of fact and conclusions of law, it was unnecessary that the Court consider and decide the contentions of respondents relative to the alleged faults chargeable to the operators of the SANTOS. This is not to say, however, that no such faults were shown.

### APPENDIX

### CAPTAIN SALTER

He was the captain of the JOHN SANTOS and was proceeding upstream from Empire at 10 miles per hour. He was at the wheel and the ringsetter, Verdun Smith, was in the wheelhouse with him. Chief Engineer Price and another man completed the crew. Aboard as passengers were Captain Salter's wife and child. When the JOHN SANTOS reached a point approximately one mile south of Pointe a la Hache, he heard the hissing sound of escaping air and noticed that a sediment bowl connected to the pneumatic system had burst. The pneumatic system consisted of a reserve tank for storage of compressed air, a compressor, a gear shifting mechanism, a whistle, tubing, and, of course, the sediment bowl. He does not know why the bowl burst, but concedes the possibility that vibration could have been the cause, although it never happened before. The bowl was checked for water and emptied, if necessary, twice each week. This sediment bowl was visible to anyone in the wheelhouse.

After he heard the hissing indicative of the loss of air pressure, five minutes elapsed before the throttles automatically and inevitably shifted to neutral as a result of the reduction in pressure. Once the throttles went to neutral, steerageway was lost, leaving the JOHN SANTOS to drift in the current which he estimates to have been 4–6 miles per hour.

When steerageway was lost, the JOHN SANTOS swung to her port, that is bow perpendicular to the west bank, and it was at this time that he says he first saw the ESSO TAMPA.

During the five minute period in which the air was gradually escaping, he kept the wheel, maintaining the same course, until he lost control at which time he tried to turn to starboard, but the vessel did not respond. Then upon sighting the ESSO TAMPA and after hearing the ESSO TAMPA sound a two-blast whistle signal, and after trying unsuccessfully to respond to the signal from the ESSO TAMPA, he turned the wheel over to Verdun Smith (although he also testified that Smith could not steer the vessel due to the loss of pressure) and left the wheelhouse for some 3–4 minutes to go below to the engine room to see if the engineer, Price, could, by starting the compressor, restore steerage. [He later says that the ESSO TAMPA sounded the two-blast signal before the JOHN SANTOS lost steerage and fell off to port and also later testifies that he was in the engine room for only 1½ minutes.]

When he returned to the wheelhouse, he made radio contact with the NOVELTY, a vessel which was then some 2 miles upriver, and informed those aboard that vessel that the JOHN SANTOS was going to be struck. During the next five minutes, while the ESSO TAMPA drew ever closer, he flashed the searchlight of the JOHN SANTOS "right on" the ESSO TAMPA (on the bow from the anchors on up, never flashing to the bank), flipping it on and off rapidly,

continuously until the collision occurred. All the while the JOHN SANTOS was heading toward the west bank as she had been at all times since she lost steerageway initially. There were no emergency flares or signals aboard the JOHN SANTOS.

After his return to the wheelhouse from the engine room, and after he commenced flashing the searchlight, he heard the ESSO TAMPA sound another (second) two-blast signal, which he was powerless to answer. While the ESSO TAMPA kept coming, never changing course, he kept flashing the light and drifting to the west bank until the bow of the JOHN SANTOS drifted into the starboard side of the ESSO TAMPA at a point about 100 feet aft of the bow. The JOHN SANTOS kept striking the side of the ESSO TAMPA as it slid down the side and on clearing the stern he could see the wheel (propeller) of the ESSO TAMPA turning, he believes, clockwise. The ESSO TAMPA appeared light. His vessel then continued into the west bank, probably as a result of suction, and came to rest. The total elapsed time from when he first saw the ESSO TAMPA until the collision was 5–10 minutes. Immediately after the JOHN SANTOS had come to rest at the west bank, while the ESSO TAMPA was standing by, a tugboat came up to check on the JOHN SANTOS. He did not see this tug before its approach and does not know from what direction it came. He never actually spoke to anyone aboard the ESSO TAMPA.

Later that evening another vessel brought another sediment bowl to the JOHN SANTOS, it was installed, and the JOHN SANTOS resumed her journey.

## VERDUN SMITH

The JOHN SANTOS was proceeding upstream in midriver against a current of 4–5 miles per hour at a speed of 8 miles per hour, and had reached a point approximately one mile below Pointe a la Hache. He had been steering the vessel, but had turned the wheel over to the captain some 30 minutes prior to the bursting of the bowl, during which time the vessel traveled some 2 to 3 miles. The bowl had been in good shape when they left Empire and, indeed, he had inspected it that very evening and it contained no water. He had drained the bowl some three days earlier.

When the bowl blew out, the air began to escape and the vessel could not be steered. The Tug NOVELTY was called on the radio. That vessel was some 3–4 miles ahead. The JOHN SANTOS began to drift on a 45° angle toward the west bank. The bow of the JOHN SANTOS never faced the east bank. It never occurred to him to drop anchor.

At the time the bowl burst, he did not know that the ESSO TAMPA was behind them. He doesn't know if the captain had seen the ESSO TAMPA as of that time. He saw the ESSO TAMPA for the first time some 15–20 minutes after they had run out of air and the bow of the JOHN SANTOS had swung around toward the west bank. [He later says that he didn't see the ESSO TAMPA until she blew her first two-blast signal which occurred some 10–12 minutes after the bowl blew out.] After they saw the tanker for some 2–3 minutes, the JOHN SANTOS' spotlight was turned on. Also a second two-blast signal of the TAMPA was heard some 2–3 minutes following the first signal. These two sets of signals were the only signals sounded. The searchlight was already being flashed when the second signal was given.

Prior to the first signal from the tanker, but after the bowl had burst, the captain went to the engine room for one minute and left him on the wheel. It was not until after the captain returned from the wheelhouse that he heard the first signal and the light was flashed on and off. He (Smith) never left the wheelhouse from the time the bowl burst until the collision which occurred 15–20 minutes after he sighted the ESSO

740

TAMPA. He could not tell if the tanker ever changed course.

The collision occurred in mid-river and as the tanker passed he could see its propeller turning, but he does not know which way it was turning. After collision, the JOHN SANTOS went into the west bank. The tug which ultimately came by did not interfere with the navigation of the colliding vessels, since it was some 7 or 8 miles upriver.

## CAPTAIN SMITH

The ESSO TAMPA was steaming up-river at a speed of approximately 12 knots (80 r.p.m.), stemming a downstream current of 1 knot. Captain Alvin Short, a river pilot, was taken aboard at Pilot Town at 4:53 on the afternoon in question. The ESSO TAMPA continued upriver uneventfully until approximately 7:55 P.M. on this clear evening. The forward lookout was a seaman named Zekos and the officer of the watch was Spacek. Pilot Short would give all orders to Spacek, who would in turn relay them to the engineroom.

At about 7:55 he (Smith), who was out of the wheelhouse area, first personally observed the JOHN SANTOS when, upon hearing the engine telegraph bell ring, he went into the wheelhouse. At that time he observed the JOHN SANTOS coming across the bow of the ESSO TAMPA at a distance ahead of less than a mile. He had glanced at the radar moments earlier. The green light of the JOHN SANTOS was observed with the glasses, indicating it was crossing from west to east. The telegraph ring which aroused his attention had been the order from Short to reduce speed to 40 r.p.m. or 5 knots over the bottom against the current.

The next order given was a hard left accompanied by a two-blast signal. The purpose of this maneuver was to swing to the stern of the crossing JOHN SANTOS. However, it was impossible to go too far left due to the approach of the downbound SAUSSY H and tow, then

located off the port bow. After the whistle signal was given, the searchlight of the JOHN SANTOS was seen turned toward the east bank and dipped twice. He assumed this meant that the JOHN SANTOS was going across to the east bank.

The distances between the vessels closed to ½ mile as the JOHN SANTOS crossed the TAMPA's bow. The TAMPA sounded its second two-blast signal and she was just beginning to straighten out when he observed erratic flashing of the SANTOS' searchlight. No sound signals were ever given by the SANTOS. The TAMPA was immediately ordered full astern and the three-blast signal, appropriate for that maneuver, was sounded. The TAMPA went astern for approximately ½ minute, but due to direction of rotation of the propeller, the stern was being drawn to the left and the bow was swinging toward the JOHN SANTOS. Thus to check this swing, the TAMPA was ordered full ahead for about ½ minute, after which the vessel was once again put full astern.

While the TAMPA was full astern, the JOHN SANTOS turned back toward the west bank, showing her red sidelight. The TAMPA, still full astern, was now making practically no headway and the JOHN SANTOS continued westward, striking the TAMPA amidship on the starboard side. The log reflects that the time of collision was 7:58 P.M. although he did not personally note the time.

After contact was made between the vessels, the TAMPA was ordered out of gear in order to reduce the danger of damage to the JOHN SANTOS due to wash or contact with the wheel. The draft of the ESSO TAMPA at that time was 25.5 feet at the stern and the wheel would have been completely submerged and would not have been visible to those aboard the SANTOS. However, while the TAMPA was out of gear the current could cause the wheel to turn.

Following the collision, the SANTOS went to the west bank and the TAMPA

stood by. The SAUSSY H, which established contact with the SANTOS, reported to the TAMPA that there was no injury to anyone aboard the SANTOS. Later the NOVELTY arrived at the scene and her crew informed the TAMPA that those aboard the SANTOS were safe and that she been out of control due to "clutch trouble."

The TAMPA then proceeded on her way.

## CAPTAIN SHORT

He boarded the ESSO TAMPA at Pilot Town late in the afternoon of August 9, 1963. The ESSO TAMPA was in ballast, drawing approximately 25 feet at the stern and 18 feet at the bow. It is the usual practice for Standard's tankers to come upriver in ballast in order to minimize the risk of damage to propellers from floating driftwood.

After he came aboard, the ESSO TAMPA proceeded upriver at about 13 knots. The radar was on and the weather was clear. The TAMPA was favoring the east bank and the JOHN SANTOS was favoring the west bank. The SANTOS was making 10 miles per hour and the faster TAMPA had been gradually coming up on the SANTOS.

When the vessels were about ½ mile apart, with the SAUSSY H downbound in mid-river some ½ to 2 miles ahead, the SANTOS turned to starboard and started across the TAMPA's bow. The SANTOS was seen to flash her light from the TAMPA to the east bank, indicating that he was crossing over to the east bank. At this time, the TAMPA sounded a two-blast signal, reduced speed and veered to the port in an effort to go astern of the SANTOS. The TAMPA was then ordered stopped, followed by an order of full astern in order to avoid the downbound SAUSSY H. The TAMPA was next placed full

ahead and then returned to full astern during which time the SANTOS turned about, showing her red sidelight. As the SANTOS started back to port, the TAMPA sounded her second two-blast signal which, as in the case of the first signal, went unanswered.

After the TAMPA had been full astern for over a minute, her stern swinging away from the SANTOS, the SANTOS proceeded (not drifting) into the starboard of the TAMPA. The TAMPA's bow cleared the SANTOS by some 400 feet. After impact, the SANTOS went to the west bank, apparently under power. Meanwhile, the SAUSSY H passed astern of the TAMPA along the west bank.

After the impact, the TAMPA stood by some 30–45 minutes before resuming her journey.

## MATE SPACEK

His regular watch was 8 to 12 o'clock P.M., but he arrived at his watch 10–12 minutes early. The SANTOS was seen to be proceeding on a straight course until the TAMPA had come up to within ¾ of a mile astern of the SANTOS. Then suddenly the SANTOS turned to the starboard, showing her green sidelight as she started across the TAMPA's bow.

The TAMPA slowed, sounded a two-blast signal and veered to the left. Then another two-blast signal was given. The TAMPA was then ordered full astern, then stopped, then briefly full ahead to check its swing, and, finally, full astern again. The SANTOS struck the side of the TAMPA.

He had seen the light of the SANTOS flashed to the east bank, but not toward the TAMPA. Prior to the collision, he never saw the SANTOS swing back to the port (toward the west bank) and never saw a red light.