GULFCOAST TRANSIT COMPANY, Plaintiff,

v.

M/S KYUNG–JU, her engines, tackle, furniture, etc., in rem, Defendant.

Civ. A. No. 71–297.

United States District Court,
E. D. Louisiana,
New Orleans Division.

April 11, 1972.

Robert M. Contois, Jr., Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, La., for plaintiff.

Alfred M. Farrell, Jr., Terriberry, Carroll, Yancey & Farrell, New Orleans, La., for Korea United Lines, defendant.

CASSIBRY, District Judge:

My task here is to find where the fault lies between two vessels which collided in the Mississippi River several miles below New Orleans.

The collision occurred on January 15, 1971 between the barge WANDA WHEELOCK and the MS KYUNG JU on the Mississippi River near the east bank off the upper tip of Cubits Gap. The barge was in tow of the MV SARAH HAYS, owned and operated by Gulfcoast Transit Company.

WANDA WHEELOCK was a 7998 ton steel barge, 420.2 feet long. The MV SARAH HAYS was a steel towboat of 433 gross tons and 112.6 feet long. It was propelled by twin screw diesel engines of combined 3200 hp. and had a crew of 11 men. The towboat and barge, as an integrated unit, were carrying phosphates and coal between Tampa and Mississippi River points.

The MS KYUNG JU, owned and operated by Korea United Lines, Inc., was an oceangoing bulk carrier, 585 feet long, with a maximum loaded draft of 33 feet 5 inches, diesel propelled with a single screw. Her home port is Seoul, Republic of Korea.

The SARAH HAYS and tow left Tampa on January 13, 1971 with the loaded WANDA WHEELOCK on a hawser astern. On the morning of January 15 at 0800 hours the master took over his regular watch when in the Gulf of Mexico on approach to the sea buoy below Southwest Pass in the lower Mississippi River below New Orleans. There was a delay because of heavy fog. When word was received by radio that the Pass had cleared, the flotilla steamed to the sea buoy and entered Southwest Pass at about 1300 hours. Visability was clear and unrestricted from then on. The master remained at the helm beyond his regular watch as he was the only officer aboard with a pilot's endorsement on his license. The river proper at Head of Passes was entered at 1545 hours Eastern Standard Time, as the SARAH HAYS' log was kept, 1445 local time.

There was congestion in the river after the fog lifted. A string of anchored ships was present, beginning at Mile 1 above Head of Passes and for the next several miles upriver. The anchored ships favored the west side, where the general anchorage is located, at varying distances off the bank, between 900 feet to 1,500 feet. Bank to bank the river's width is 4,500 feet, while the navigable width here, because of shoaling immediately adjacent to the west bank, is 4,000 feet. There was a downriver current estimated at 1 to 2 miles per hour. The wind was gusting out of the north at about 20 miles per hour.

After entering the river proper, and at about Mile ½ above Head of Passes, the captain of the SARAH HAYS switched his barge around to a pushing position. This operation continued for some 17 minutes, until at about 1506 local time the HAYS and the pushtow got under-

way. It was then some 22 minutes before collision. The captain had been at the wheel in excess of eight hours. The mate was with him in the wheelhouse. The radar had been secured. While underway, there were still five men working at the bow of the barge WANDA WHEELOCK, none of them assigned as lookout. The anchor windlass on the barge and its diesel motor were in continuous operation in taking in the large towing hawser. The crew on the barge were busy and did not observe the heavy traffic in the river until immediately before collision.

At full speed of 7½ miles per hour the SARAH HAYS and tow began passing the anchored and underway ships while favoring the west side. The first, the CHARLOTTE LYKES, was underway, maneuvering to starboard to head downriver. The SARAH HAYS came under her stern when the CHARLOTTE LYKES was broadside. The second and third ships, the STOLT HAWK and the PRINCESS AURORA, were preparing to get underway. The SARAH HAYS passed each to her starboard while running the west side. The fourth in line was the CORNISH CITY, nearest to the west bank, some 900 feet off. The SARAH HAYS, having passed west of the PRINCESS AURORA, turned to starboard and took the CORNISH CITY on the towboat's port hand. The SARAH HAYS proceeded on a diagonal heading to cross the river, angling about 35 degrees with the axis. Above the CORNISH CITY was the anchored CITADEL and above her was the KYUNG JU.

The KYUNG JU, in a light draft of 12 feet 7 inches forward and 22 feet 6 inches aft, had been at anchor, bow upstream, favoring the west side. Her location, according to the anchor bearings in the log, was 29°12.0′N, 89°16.7′W. This is approximately across from Old Quarantine Station Light at the upper end of Cubits Gap and was in the designated anchorage.

The pilot who boarded the KYUNG JU was the captain of the watch and had come on the ship to relieve the traffic congestion. He intended to turn the KYUNG JU slowly to starboard across to the east side of the river and go down to PILOTTOWN, two miles away, where another pilot would relieve. After weighing anchor at 1517 hours, the KYUNG JU began her gradual pivoting maneuver under various bells to the engine room. Her bow, headed upriver, came about in a clockwise direction to her own starboard. The ship then came broadside in the river until at 1524 hours the engine was put to half ahead with hard right rudder to swing the bow downriver.

At about this time the captain of the SARAH HAYS first sighted the KYUNG JU. He testified that she was about ¾ of a mile away coming out of the west side anchorage, riding high in the water, nearly broadside, headed across toward the east side, while swinging slowly to starboard, and presumably to head downstream in the normal fashion. However, the SARAH HAYS continued to push her tow at full speed on a steady heading towards Old Quarantine Light, on a diagonal crossing of the river towards the east side. The towboat captain attempted to raise the KYUNG JU via radio unsuccessfully. No other action was promptly taken as the maneuvering ship was studied with binoculars.

The SARAH HAYS did not alter her course to port and attempt to come up the middle of the 4,500 foot wide river and thus pass the maneuvering KYUNG JU to the starboard of the towboat in safety.

Aboard the KYUNG JU, immediately after the half ahead engine order, logged at 1524 hours, the pilot sighted the barge WANDA WHEELOCK and SARAH HAYS. The flotilla had come through the gap between the PRINCESS AURORA and the CORNISH CITY, already headed on her steady diagonal towards the east. The KYUNG JU's pilot, in the midst of his maneuver in swinging the ship, immediately sounded two blasts on the whistle proposing a starboard-to-starboard passing,

and checked the swing by rudder amidship. The two blasts first attracted the attention of those on the CORNISH CITY, anchored in the west side.

The two blasts were unheard by the captain or mate of the SARAH HAYS in the enclosed wheelhouse with all windows closed save one that might have been cracked. Implied in the testimony of the towboat's captain, is the fact that the noise level from the diesel engines and exhaust stack just abaft the pilothouse probably blocked his hearing the KYUNG JU's signal. On the bow of the barge WANDA WHEELOCK, some 400 feet forward of the SARAH HAYS' wheelhouse, none of the five men working heard the KYUNG JU's whistle signal, or then knew of her presence, because of the noise of the diesel motor operating the windlass in still securing the towing hawser.

Just after the KYUNG JU had sounded the unheard two blasts, the captain of the SARAH HAYS sounded one blast proposing to pass port-to-port. The witness admitted that at that moment, he could have altered the flotilla's heading and passed starboard-to-starboard. He estimated it was about four minutes before collision.

When the KYUNG JU's pilot heard the SARAH HAYS' one blast in apparent response, he instantly sounded four rapid blasts for danger, and after a pause repeated the two blast signal. The ship's starboard swing having been checked, her advance towards the east bank was 2 to 3 miles per hour.

The KYUNG JU's danger signal and repeated two blasts were again unheard aboard the SARAH HAYS. Her captain, believing he had had no response to his one blast proposal, then sounded a danger signal without reducing speed. He approximated it to be two minutes before collision.

The KYUNG JU's pilot, on hearing the danger signal, and another one blast, ordered the wheel hard to port, and in an attempt to swing the bow, ordered the engine full speed ahead. It was logged at 1525 hours. Because of the difficulty in swinging the light draft vessel upriver against the current and into the 20 mile wind, emergency full ahead was given. The KYUNG JU's bow came about to port, canting upriver. The engine was then rung to full astern and the port anchor dropped just before impact.

The SARAH HAYS had kept coming. At an estimated one minute before collision, her engines were put to full astern and the first avoiding action was taken by putting on starboard rudder. The tow turned an estimated 15 degrees as the port bow of the barge WANDA WHEELOCK, with substantial headway, struck heavily against the starboard side, amidship, of the KYUNG JU. The ship logged the collision at 1528 hours. The collision occurred about 600 feet off the east bank of the upper tip of Cubits Gap.

The impact severed the towing cables and the barge broke adrift into Cubits Gap. Just before collision the SARAH HAYS' captain had ordered the crew at the bow of the barge WANDA WHEE-LOCK to let go anchor. The men had fled for shelter, did not hear the order, and let go the barge's anchor on their own after the collision had occurred.

■ From the facts found I conclude that the SARAH HAYS was at fault in taking and continuing a diagonal heading across the river, steady on Old Quarantine Light on the east bank. Had she turned up mid-river, after a proper exchange of signals, she could have passed the KYUNG JU safely.

■ The SARAH HAYS was further at fault in failing to hear the two blast passing signal of the KYUNG JU for starboard-to-starboard. Griffin on Collision, (1948) Sec. 76, p. 215, and cases cited. Had the towboat captain heard the signal, he would have replied in kind, as his testimony implies, and shaped his tow for mid-river. The SARAH HAYS always had it in her power to avoid the collision by an ob-

viously required alteration to port and sounding two blasts.

■ The SARAH HAY'S captain recognized the maneuver in which the KYUNG JU was engaged and knew what she was doing. Instead of permitting the ship to continue unencumbered in turning about in the east side of the river, the SARAH HAYS sounded a one blast passing signal for port-to-port and continued on. This necessarily would force the 530 foot long flotilla across the swinging bow of the ship. The SARAH HAYS was at fault for so proposing and attempting such a passing.

■ According to her own testimony, the SARAH HAYS did not receive an assent to her one blast proposal for port-to-port passing. For an admitted two minutes thereafter, the flotilla proceeded on the same heading at full speed of 7½ miles per hour. The Inland Rules require an assent to a passing signal and a mutual agreement. Pilot Rules for Inland Waters, Title 33 CFR, Sec. 80.3. Norfolk & Washington, D. C. Steamboat Co., et al. v. United States of America, 74 F.2d 977, 981, 1935 AMC 179, 185 (4 Cir., 1935); Poling, Inc. v. United States of America, 55 F.2d 921, 1932 AMC 790 (2 Cir., 1932); Ariosa-Segundo, 116 F.2d 492, 493, 494, 1941 AMC 214, 216, 217 (2 Cir., 1941). They do not countenance a vessel pressing on at full speed as did the SARAH HAYS in an attempt to force a passing without an agreement.

The evidence is clear that when the SARAH HAYS sounded her one blast passing signal in the face of the KYUNG JU's unheard two blasts, the KYUNG JU promptly sounded the danger signal. The several rapid blasts were unheard aboard the approaching barge WANDA WHEELOCK and the SARAH HAYS. The only excuse offered was that the noise level of the windlass motor on the barge, the closed windows in the wheelhouse, and the twin diesels and stack exhaust of the towboat might have prevented audibility. For this the flotilla is culpable.

In any event, it was the duty of the SARAH HAYS, if her captain thought his one blast proposal was unanswered, to stop headway promptly and sound for danger. Her captain admitted and wrote in his log that he did not understand the intention of the KYUNG JU. The Inland Rules, Inland Rules, Art. 18, Rule III, 33 U.S.C. § 203, require that such a vessel "shall immediately signify the same by giving several short and rapid blasts". Further, "To fail to reverse the engines in the face of danger is sufficient to fasten liability. . . ." The Cushing, 292 F. 560 (2 Cir. 1923). Even in circumstances of uncertainty a vessel is under the duty to stop and reverse immediately in order to avoid risk of collision. The New York, 175 U.S. 187, 201, 202, 20 S.Ct. 67, 44 L.Ed. 126 (1899); The Victory, 168 U.S. 410, 422, 18 S.Ct. 149, 42 L.Ed. 519 (1897); Chinook-Clare, 34 F.2d 614, 616, 1929 AMC 1175, 1178 (2 Cir.); Quoque-Transfer No. 12, 47 F.2d 873, 874, 1931 AMC 538, 540 (2 Cir. 1931); Ekefors v. Seatrain Texas, 125 F.Supp. 101, 107, 1954 AMC 1820, 1828 (E.D.N.Y., 1954); McElroy-Walker, 127 F.Supp. 867, 870, 1955 AMC 413, 418 (E.D.La., 1955); Tanker Perryville-Tugs Connie Cenac and Capt. Tenner Cenac, 276 F.Supp. 317, 325 (E.D.La., 1967), aff'd 404 F.2d 698, 703, 1969 AMC 135, 141 (5 Cir. 1968); Coastal Towing Corp. v. M/V Emily Jean, 437 F.2d 542, 546, 1971 AMC 595, 599 (5 Cir. 1971). Her only avoiding action came in the jaws of collision and much too late. For this she is at fault.

■ The contention is advanced on behalf of the SARAH HAYS that because the flotilla was on a steady diagonal heading when sighted by the KYUNG JU and bearing on the ship's starboard side, there was a crossing situation under the Starboard Hand Rule. Inland Rules, Art. 19, 33 U.S.C. § 204; Art. 21, 33 U.S.C. § 206; Art. 22, 33 U.S.C. § 207. A crossing situation would have had the SARAH HAYS as the privileged or "holding-on" vessel under the duty to continue her course and

speed, while the KYUNG JU would have been the burdened or "giving-way" vessel, under the duty to stand clear by backing or turning to starboard, and allow the flotilla to cross her bow.

This contention is without merit, as the Starboard Hand Rule has no application here. It is well settled that for there to be a crossing situation, each vessel must be steering a steady, discernible course. The KYUNG JU had never taken a definite course. She was engaged in a known, obvious maneuver from the time she weighed anchor and began turning her bow from its upriver heading gradually to starboard. The captain of the SARAH HAYS was well aware of what the vessel was doing and said, "When I first saw her she was swinging towards the east bank . . . coming out on a maneuver, swinging to the right . . . I assume that he was turning to head downstream". At that first sighting, the KYUNG JU had come near broadside, and it was about four minutes before collision. It was not a crossing situation. As it is not specifically covered by the Steering and Sailing Rules,[1] it is a situation of special circumstances. Art. 29 Inland Rules, 33 U.S.C. § 221.

In this district, it has been held specifically in respect to the Pilottown anchorage area that "a vessel which is maneuvering . . . out from an anchorage ground is not a definite course or a fixed speed. . . ." Arfeld-Lacuna, 42 F.2d 745, 748, 1930 AMC 1703, 1707, (E.D.La., 1930). Accordingly, the Starboard Hand Rule is not applicable as the situation is one of special circumstances.[2]

There was no fault on the KYUNG JU. She was placed *in extremis* by the "cross signal" of one blast from the SARAH HAYS and the towboat's inordinate holding of a collision heading. The KJUNG JU took instant action. The danger signal was sounded and the two blasts repeated. When the SARAH HAYS responded with her danger signal, the KYUNG JU attempted to turn out of the way to port, with a headway of 2 to 3 miles per hour. The port swing was accomplished by full ahead on the engines. The engines were then reversed and the port anchor dropped when the bow was but a ship length off the east bank. There was nothing more that the maneuvering vessel could have done.

"Where fault on the part of one vessel . . . is, of itself, sufficient to account for the disaster it is not enough for such vessel to raise a doubt with regard to the management of the other vessel." The City of New York, 147 U.S. 72, 85, 13 S.Ct. 211, 216, 37 L.Ed. 84 (1893). Further, ". . . where the active fault of one vessel so flagrantly and heavily outweighs the passive faults of omission of the other vessel, the interests of justice are best served by condemning the more culpable vessel completely." Star of Honduras–Queenston Heights, 220 F.2d 120, 123, 1955 AMC 797, 801 (5 Cir. 1955).

An interlocutory judgment will enter against Gulfcoast Transit Company as

1. See discussion "Situations Not Specifically Covered by the Rules" in The Rules of the Nautical Road by Captain Raymond F. Farwell (1961 Ed.), p. 333, and "Special Circumstances Arising from Nature of Manoeuvre or from General Conditions" in Griffin on Collision (1949 Ed.), p. 517, Sec. 229.

2. The rule of special circumstances was applied in The Servia, 149 U.S. 144, 156, 13 S.Ct. 817, 37 L.Ed. 681 (1893), and in Velma Lykes-Tug Anita D. and Tow, 253 F.2d 444, 1958 AMC 722 (5 Cir.), in which the Starboard Hand Rule was specifically rejected. Other cases of special circumstances when a maneuvering vessel is being approached by another are Fort St. George-Olympic, 27 F.2d 788, 1928 AMC 1486 (2 Cir.); Cornell Steamboat Co. v. USA, 1925 AMC 169 (SD NY) (not otherwise reported); President Hayes-American Eagle, 3 F.Supp. 717, 1933 AMC 680 (SD NY), aff'd. per curiam, 68 F.2d 993, 1934 AMC 86 (2 Cir.); Chagres-Ocean Vagrant, 179 F.2d 495, 1950 AMC 229 (2 Cir.); Stuyvesant Ins. Co. v. SS Esso Tampa, 286 F.Supp. 730, 736 (ED La., 1968).

owner of the MV SARAH HAYS dismissing its complaint at plaintiff's costs. Korea United Lines, Inc., as owner of the MS KYUNG JU, will have judgment on its counterclaim with interest from the day of collision and costs. If the parties are unable to agree on damages, they are to report to the court for further proceedings.